WILSON, UNITED STATES ATTORNEY FOR THE WESTERN DISTRICT OF MISSOURI, *v.* NEW ET AL., RECEIVERS OF THE MISSOURI, OKLAHOMA & GULF RAILWAY COMPANY.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

No. 797.   Argued January 8, 9, 10, 1917.—Decided March 19, 1917.

The effect of the Act of September 3, 5, 1916, entitled "An Act to establish an eight-hour day for employees of carriers engaged in interstate and foreign commerce, and for other purposes," c. 436, 39 Stat. 721, is not only to establish permanently an eight-hour standard for work and wages as between the carriers and employees affected, but also to fix a scale of minimum wages, to wit, the rate of wages then existing, for the eight-hour day and proportionately for overtime, to be in force only during the limited period defined by the act.

Viewed as an act establishing an eight-hour day as the standard of service by employees, the statute is clearly within the power of Congress under the commerce clause.

The power to establish an eight-hour day does not beget the power to fix wages.

In an emergency arising from a nation-wide dispute over wages between railroad companies and their train operatives, in which a general strike, commercial paralysis and grave loss and suffering overhang the country because the disputants are unable to agree,

Congress has power to prescribe a standard of minimum wages, not confiscatory in its effects but obligatory on both parties, to be in force for a reasonable time, in order that the calamity may be averted and that opportunity may be afforded the contending parties to agree upon and substitute a standard of their own.

Where a particular subject lies within the commerce power, the extent to which it may be regulated depends on its nature and the appropriateness of means.

The business of common carriers by rail is in one aspect a public business, because of the interest of society in its continued operation and rightful conduct; and this public interest gives rise to a public right of regulation to the full extent necessary to secure and protect it.

Although emergency may not create power (*Ex parte Milligan*, 4 Wall. 2), it may afford reason for exerting a power already enjoyed.

The act above cited in substance and effect amounts to an exertion of the power of Congress, existing under the circumstances, to arbitrate compulsorily the dispute between the parties—a power susceptible of exercise by direct legislation as well as by enactment of other appropriate means for reaching the same result.

Viewed as an act fixing wages, the statute merely illustrates the character of regulation essential, and hence permissible, for the protection of the public right.

The act does not invade the private rights of carriers, since all their business and property must be deemed subject to the regulatory power to insure fit relief by appropriate means.

The act does not invade private rights of employees, since their rights to demand wages according to their desire and to leave the employment, individually or in concert, if the demand is refused, are not such as they might be if the employment were in private business, but are necessarily subject to limitation by Congress, the employment accepted being in a business charged with a public interest which Congress may regulate under the commerce power.

The act is not wanting in equality of protection either because it exempts certain short-line and electric railroads, or because it deals with the wages of those employees only who are engaged in the movement of trains—they being the class concerned in the dispute which threatened interruption of commerce.

Whether the provision for penalties is unconstitutional will not be determined in a suit not concerning penalties.

The history of the dispute, the inquiries and circumstances which culminated in the legislation, the nature of the provisions made and a comparison of them with the issues which existed between the dis-

putants, refute the claim that the act was passed without consideration and in arbitrary disregard of the rights of the carriers and the public.

After the paramount duty to enforce the Constitution, the very highest of judicial duties is to give effect to the legislative will, with judgment uninfluenced by those considerations which belong to the legislature alone.

The contention that the act is unworkable is without merit.

'THE case is stated in the opinion.

*The Solicitor General* and *Mr. Frank Hagerman,* Special Assistant. to the Attorney General, with whom *The Attorney General* and *Mr. Assistant Attorney General Underwood* were on the briefs, for appellant.

The act is constitutional as an hours-of-service law.

It is constitutional if purely a wage law. From the beginning, Congress's power. over interstate commerce has been declared to be supreme. It consists of "direct supervision, control, and management" and extends to the regulation of employees while engaged in interstate commerce; also to the regulation of the relations of common carriers and their employees while both. are engaged in interstate commerce. *Second Employers' Liability Cases,* 223 U. S. 1, 48–49. The wage regulation here involved has substantial connection with interstate commerce, because its natural tendency is to keep open the channels of interstate commerce and render such commerce safer and more efficient. Whether looked at from the standpoint of promoting. commerce or removing. obstructions to its free flow, the regulation of wages bears a close relation to the proper performance by carriers of their public duties. The efficiency and safety of railroad service depend upon the skill and physical fitness of the employees. It is just as necessary to properly care for employees as to keep in good condition the physical instrumentalities used in interstate commerce. Physical efficiency is

impossible without proper living conditions, which demand suitable food, clothing, housing, rest, and recreation. These, in turn, can not be secured without the payment of an adequate wage. An adequate wage, therefore, is essential to safe, regular, and efficient service in interstate commerce, and the public, through Congress, has a right to demand its payment. *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549, 570.

On the other hand, the public is interested in preventing the payment of wages which are too high, since they constitute the largest element in the cost of transportation and necessarily affect rates. An unreasonably high wage means an unjust rate or impaired service. In either event, it is the public that pays, and the public has the right to demand the regulation of wages to the end that it may enjoy reasonable and just rates.

But wage regulation has a still more vital connection with interstate commerce. Disputes about wages may be, and frequently are, the cause of interference with or entire stoppage of the flow of interstate commerce. In this law the idea of the board of arbitration has been adopted, though the regulation is accomplished by direct action of Congress rather than through the instrumentality of a commission. And by this regulation of the wage relation and the hours of service of railroad employees a disastrous strike was averted and the channels of interstate commerce kept open. Surely, Congress's power over interstate commerce, which has been so many times declared to be supreme, is, in the face of an interference greater than any other that can be imagined, ample enough to authorize the assumption of "direct supervision, control, or management" over the wage relation of persons engaged in such commerce. *McDermott* v. *Wisconsin,* 228 U. S. 115, 128.

The law does not conflict with any of the limitations upon the power of Congress prescribed in the Constitu-

tion.   It does not deprive the carriers of liberty of con-
tract nor take property without due process of law.   If
Congress has power to regulate the hours of labor and the
wage relation of persons engaged in interstate commerce,
the fact that some contracts are interfered with is immate-
rial and not forbidden by the Fifth Amendment.   The same
principle holds with reference to the taking of property
without due process of law.   *Chicago, Burlington & Quincy
Ry. Co.* v. *Drainage Commissioners,* 200 U. S. 561, 593;
*Noble State Bank* v. *Haskell,* 219 U. S. 104; *Greenleaf
Johnson Lumber Co.* v. *Garrison,* 237 U. S. 251.

The classifications made in the act are not arbitrary.
*Baltimore & Ohio R. R. Co.* v. *Interstate Commerce Com-
mission,* 221 U. S. 612; *Chesapeake & Ohio Ry. Co.* v.
*Conley,* 230 U. S. 513, 522; *St. Louis, Iron Mountain &
Southern Ry. Co.* v. *Arkansas,* 240 U. S. 518.

The act is workable.   The penalties are not excessive.

*Mr. Walker D. Hines* and *Mr. John G. Johnson,* with
whom *Mr. Arthur Miller* was on the briefs, for appellees:

The act is a direct attempt to regulate the method of
computing compensation and to fix the amount thereof.
No support for its constitutionality can be derived from
any theory that it establishes a public policy that hours
of train service should be shortened, and has a direct
tendency to promote that policy.

In order to hold that the act is within the commerce
power it will be necessary for the court to see that the pro-
visions have a substantial relation to some purpose which
is within that power, *Adair* v. *United States,* 208 U. S. 161,
178; *Second Employers' Liability Cases,* 223 U. S. 1, 49;
determining the purpose from the natural and legal effect
of the language, *Soon Hing* v. *Crowley,* 113 U. S. 703, 710;
*Lochner* v. *New York,* 198 U. S. 45, 64; *Minnesota* v. *Bar-
ber,* 136 U. S. 313, 319.   Furthermore, whatever the pur-
pose, no provision can be upheld under the commerce

power which violates the Fifth Amendment. *Lottery Case,* 188 U. S. 321, 362; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 336; *United States* v. *Joint Traffic Association,* 171 U. S. 305, 571. Manifestly Congress has no wider choice of means to accomplish a constitutional purpose than any state legislature would have, for both would be subject to constitutional limitations.

Section 3 of the act, even if susceptible of the construction assumed by its advocates, is unconstitutional because it is not a regulation of commerce among the States and violates the Fifth Amendment. The standard of compensation and the amount of compensation are mere incidents of commerce not *per se* within the power of Congress. *Hooper* v. *California,* 155 U. S. 648. The *Second Employers' Liability Case,* 223 U. S. 1, is not authority for the position that Congress has power to regulate the master-and-servant relationship *per se* in all its aspects between railroad companies and their trainmen; the power was there based on the substantial tendency to make transportation safe. A regulation of the amount of compensation which the railroad company shall pay its employee for his services can have no more relationship to any purpose to regulate commerce among the States than a regulation as to the price the railroad company shall pay for its locomotives, rails, cross ties or fuel or other supplies.

Section 3 is an extreme interference with the liberty of contract. *Allgeyer* v. *Louisiana,* 165 U. S. 578, 589; *Adair* v. *United States,* 208 U. S. 161, 172. Wages, which Congress assumes to determine, are the very heart of the contract between the employer and employee. On its face § 3 is for the direct pecuniary benefit of a particular class of a community, to wit, the persons who are actually engaged in the operation of railroad trains. *Colon* v. *Lisk,* 153 N. Y. 188; *Lawton* v. *Steel,* 152 U. S. 133. It is a direct taking of the carrier's property without compensation and the transfer of the same to private individuals.

Section 3 cannot be upheld on the ground that its object was to avert the strike, that it has a substantial relation to that object, and that the interference with the liberty of contract and the appropriation of property without compensation to the benefit of the employees are under such circumstances permissible. The act does not purport to avoid the strike, and that end could not be appropriately accomplished by destroying the liberty of contract of the common carrier, or taking its property and giving it to another without provision for compensating the carrier. No case can be found where the property of one was transferred to another merely to appease that other and prevent him from committing an injury or doing harm to the community; and that is what § 3 would accomplish if it were to be justified on the ground that it was passed to avert the strike. The principle of necessity permitting of the destruction of buildings where absolutely necessary to stay conflagration, is not analogous. Freund on Police Power, pp. 563, 565.

The power of Congress is not enlarged by emergency. If it were, Congress could enlarge its powers at will by simply postponing its dealing with a matter until it had reached a dangerous crisis. Another answer is that Congress and not the courts would in practice be the judge as to when the crisis existed; so that if such a power be conceded constitutional limitations will cease to have a meaning. *Ex parte Milligan*, 4 Wall. 2.

Congress cannot regulate commerce among the States by entering into an extra-constitutional arrangement with the labor unions to avoid a strike, and then, as a consideration to the labor unions for carrying out this arrangement, enact legislation which is not in itself a prevention of the strike and which has no legal relation to that end.

Section 3 cannot be sustained on the ground that Congress has the power to provide methods for settling controversies between railroad companies and their train-

service employees and that § 3 is an appropriate means of settlement; nor upon the theory that its object is to prevent unsafe or inefficient railroad operation as a result of wages which are too low, that Congress has the power to accomplish that object through raising wages, and that § 3 is an appropriate means to accomplish that object.

It cannot be upheld by analogy to the rate-making power. It does not purport to protect the public or interstate commerce against improper wages. On the contrary, it requires a heavy increase in existing wages. Legislation respecting the amount of wages to be in any sense analogous to rate-fixing legislation would have to be binding on the person who makes the charge, i. e., the employee. But § 3 is binding only on the person who has to pay the charge, i. e., the employer. It cannot be upheld on any theory of a power in Congress to control railroad expenses so as to promote reasonable rates; nor on the ground that hereafter the railroad companies may be reimbursed through increased rates or otherwise for the deprivation of their property and its appropriation to the private use of the employees. *Chicago, Milwaukee & St. Paul R. R. Co.* v. *Wisconsin*, 238 U. S. 491.

Section 3 is void for its failure to define a standard of conduct. That a statute must itself prescribe or designate the standard by which the parties affected can govern their conduct, to the end that they may avoid incurring the penalties prescribed, is recognized in *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Polt*, 232 U. S. 165; *International Harvester Co.* v. *Kentucky*, 234 U. S. 216; *United States* v. *Pennsylvania R. R. Co.*, 242 U. S. 208.

The entire act is unconstitutional on account of the invalidity of § 3. Section 1 is unconstitutional *per se.* It is an arbitrary interference with reasonable methods of contracting and has no substantial relation to the promotion of commerce among the States. It is unconstitutional because it provides no standard of conduct. *Chicago,*

*Milwaukee & St. Paul Ry. Co.* v. *Polt, supra; International Harvester Co.* v. *Kentucky, supra; United States* v. *Pennsylvania R. R. Co., supra; United States* v. *Northern Pacific Ry. Co.,* 242 U. S. 190.

The act arbitrarily discriminates in not applying to employees not engaged in operating trains, or to street and interurban railroads and other roads not 100 miles long. It is void on account of the excessive penalties. *Missouri, Kansas & Texas Ry. Co.* v. *United States,* 231 U. S. 112; *Bonnett* v. *Vallier,* 136 Wisconsin, 193; *Wadley Southern Railway Co.* v. *Georgia,* 235 U. S. 651, 655.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Was there power in Congress under the circumstances existing to deal with the hours of work and wages of railroad employees engaged in interstate commerce, is the principal question here to be considered. Its solution as well as that of other questions which also arise will be clarified by a brief statement of the conditions out of which the controversy arose.

Two systems controlled in March, 1916, concerning wages of railroad employees; one, an eight-hour standard of work and wages with additional pay for overtime, governing on about fifteen per cent. of the railroads; the other, a stated mileage task of 100 miles to be performed during ten hours with extra pay for any excess, in force on about eighty-five per cent. of the roads. The organizations representing the employees of the railroads in that month made a formal demand on the employers that as to all engaged in the movement of trains except passenger trains the 100-mile task be fixed for eight hours, provided that it was not so done as to lower wages and provided that an extra allowance for overtime calculated by the minute at one and one-half times the rate of the regular

hours service be established.  The demand made this standard obligatory on the railroads but optional on the employees, as it left the right to the employees to retain their existing system on any particular road if they elected to do so.  The terms of the demand were as follows, except the one which reserved the option which is in the margin,[1] and others making Article 1 applicable to yard and switching and hostling service.

"Article 1 (a)  In all road service 100 miles or less, eight hours or less will constitute a day, except in passenger service.  Miles in excess of 100 will be paid for at the same rate per mile.

"(b)  On runs of 100 miles or less overtime will begin at the expiration of eight hours.

"(c)  On runs of over 100 miles overtime will begin when the time on duty exceeds the miles run divided by 12½ miles per hour.

"(d)  All overtime to be computed on the minute basis and paid for at time and one-half times the pro rata rate.

"(e)  No one shall receive less for eight hours or 100 miles than they now receive for a minimum day or 100 miles for the class of engine used or for service performed.

"(f)  Time will be computed continuously from time required for duty until release from duty and responsibility at end of day or run."

---

[1] "Article 4.  Any rates of pay, including excess mileage or arbitrary differentials that are higher, or any rules or conditions of employment contained in individual schedules in effect January 1, 1916, that are more favorable to the employees, shall not be modified or affected by any settlement reached in connection with these proposals.  The general committee representing the employees on each railroad will determine which is preferable and advise the officers of their company.  Nothing in the settlement that may be reached on the above submitted articles is to be construed to deprive the employees on any railroad from retaining their present rules and accepting any rates that may be agreed upon or retaining their present rates and accepting any rules that may be agreed upon."

The employers refused the demand and the employees through their organizations by concert of action took the steps to call a general strike of all railroad employees throughout the whole country.

The President of the United States invited a conference between the parties. He proposed arbitration. The employers agreed to it and the employees rejected it. The President then suggested the eight-hour standard of work and wages. The employers rejected this and the employees accepted it. Before the disagreement was resolved the representatives of the employees abruptly called a general strike throughout the whole country fixed for an early day. The President, stating his efforts to relieve the situation and pointing out that no resources at law were at his disposal for compulsory arbitration, to save the commercial disaster, the property injury and the personal suffering of all, not to say starvation, which would be brought to many among the vast body of the people if the strike was not prevented, asked Congress, first, that the eight-hour standard of work and wages be fixed by law, and second, that an official body be created to observe during a reasonable time the operation of the legislation and that an explicit assurance be given that if the result of such observation established such an increased cost to the employers as justified an increased rate, the power would be given to the Interstate Commerce Commission to authorize it. Congress responded by enacting the statute whose validity as we have said we are called upon to consider. Act of September 3, 5, 1916, 39 Stat. 721, c. 436. The duty to do so arises from the fact that the employers, unwilling to accept the act and challenging the constitutional power of Congress to enact it, began this typical suit against the officers of certain labor unions and the United States District Attorney to enjoin the enforcement of the statute. The law was made to take effect only on the first of January, 1917. To expedite the

final decision before that date, the representatives of the labor unions were dropped out, agreements essential to hasten were made and it was stipulated that pending the final disposition of the cause the carriers would keep accounts of the wages which would have been earned if the statute was enforced so as to enable their payment if the law was finally upheld. Stating its desire to coöperate with the parties in their purpose to expedite the cause, the court below, briefly announcing that it was of opinion that Congress had no constitutional power to enact the statute, enjoined its enforcement and as the result of the direct appeal which followed we come, after elaborate oral and printed arguments, to dispose of the controversy.

All the propositions relied upon and arguments advanced ultimately come to two questions: First, the entire want of constitutional power to deal with the subjects embraced by the statute, and second, such abuse of the power if possessed as rendered its exercise unconstitutional. We will consider these subjects under distinct propositions separately.

I. *The entire want of constitutional power to deal with the subjects embraced by the statute.*

To dispose of the contentions under this heading calls at once for a consideration of the statute and we reproduce its title and text so far as is material.

"An Act To establish an eight-hour day for employees of carriers engaged in interstate and foreign commerce, and for other purposes.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That beginning January first, nineteen hundred and seventeen, eight hours shall, in contracts for labor and service, be deemed a day's work and the measure or standard of a day's work for the purpose of reckoning the compensation for services of all employees who are now or may hereafter be employed by any common carrier by railroad, except

railroads independently owned and operated not exceeding one hundred miles in length, electric street railroads, and electric interurban railroads, which is subject to the provisions of the Act of February fourth, eighteen hundred and eighty-seven, entitled 'An Act to regulate commerce,' as amended, and who are now or may hereafter be actually engaged in any capacity in the operation of trains used for the transportation of persons or property on railroads, except railroads independently owned and operated not exceeding one hundred miles in length, electric street railroads, and electric interurban railroads, . . .

"Sec. 2. That the President shall appoint a commission of three, which shall observe the operation and effects of the institution of the eight-hour standard workday as above defined and the facts and conditions affecting the relations between such common carriers and employees during a period of not less than six months nor more than nine months, in the discretion of the commission, and within thirty days thereafter such commission shall report its findings to the President and Congress; . . .

"Sec. 3. That pending the report of the commission herein provided for and for a period of thirty days thereafter the compensation of railway employees subject to this Act for a standard eight-hour workday shall not be reduced below the present standard day's wage, and for all necessary time in excess of eight hours such employees shall be paid at a rate not less than the pro rata rate for such standard eight-hour workday.

"Sec. 4. That any person violating any provision of this Act shall be guilty of a misdemeanor and upon conviction shall be fined not less than $100 and not more than $1,000, or imprisoned not to exceed one year, or both."

There must be knowledge of the power exerted before determining whether as exercised it was constitutional and we must hence settle a dispute on that question before going further. Only an eight-hour standard for work

and wages was provided, is the contention on the one side, and in substance only a scale of wages was provided, is the argument on the other. We are of the opinion that both are right and in a sense both wrong in so far as it is assumed that the one excludes the other. The provision of section one that "eight hours shall . . . be deemed a day's work and the measure or standard of a day's work," leaves no doubt about the first proposition. As to the second, this is equally true because of the provision of section three forbidding any lowering of wages as a result of applying the eight-hour standard established by section one during the limited period prescribed in section two. Both provisions are equally mandatory. If it be said that the second, the depriving of all power to change the wages during the fixed period, is but ancillary to the first command, the standard of eight hours, that would not make the prohibition as to any change of wages any the less a fixing of wages. It certainly would not change the question of power unless it could be assumed that the legislative power to fix one thing, the standard of hours, could be enforced by exerting the power to do another, fix the wages, although there was no legislative authority to exert the latter power. The doing of one thing which is authorized cannot be made the source of an authority to do another thing which there is no power to do. If to deprive employer and employee of the right to contract for wages and to provide that a particular rate of wages shall be paid for a specified time is not a fixing of wages, it is difficult to see what would be.

However, there is this very broad difference between the two powers exerted. The first, the eight-hour standard, is permanently fixed. The second, the fixing of the wage standard resulting from the prohibition against paying lower wages, is expressly limited to the time specified in section two. It is, therefore, not permanent but temporary, leaving the employers and employees free as to

the subject of wages to govern their relations by their own agreements after the specified time. Concretely stated, therefore, the question is this: Did Congress have power under the circumstances stated, that is, in dealing with the dispute between the employers and employees as to wages, to provide a permanent eight-hour standard and to create by legislative action a standard of wages to be operative upon the employers and employees for such reasonable time as it deemed necessary to afford an opportunity for the meeting of the minds of employers and employees on the subject of wages? Or, in other words, did it have the power in order to prevent the interruption of interstate commerce to exert its will to supply the absence of a wage scale resulting from the disagreement as to wages between the employers and employees and to make its will on that subject controlling for the limited period provided for?

Coming to the general considerations by which both subjects must be controlled, to simplify the analysis for the purpose of considering the question of inherent power, we put the question as to the eight-hour standard entirely out of view on the ground that the authority to permanently establish it is so clearly sustained as to render the subject not disputable.[1]

That common carriers by rail in interstate commerce are within the legislative power of Congress to regulate commerce is not subject to dispute.[2] It is equally certain that where a particular subject is within such authority the extent of regulation depends on the nature and character of the subject and what is appropriate to its regulation.[3] The powers possessed by government to deal with

[1] *Baltimore & Ohio R. R. Co.* v. *Interstate Commerce Commission,* 221 U. S. 612; *Missouri, Kansas & Texas Ry. Co.* v. *United States,* 231 U. S. 112.

[2] *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366.

[3] *McCulloch* v. *Maryland,* 4 Wheat. 316, 421–423; *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 472; *Lottery Case,* 188 U. S. 321; *Clark Distilling Co.* v. *Western Maryland Ry. Co.,* 242 U. S. 311.

a subject are neither inordinately enlarged or greatly dwarfed because the power to regulate interstate commerce applies. This is illustrated by the difference between the much greater power of regulation which may be exerted as to liquor and that which may be exercised as to flour, dry-goods and other commodities. It is shown by the settled doctrine sustaining the right by regulation absolutely to prohibit lottery tickets and by the obvious consideration that such right to prohibit could not be applied to pig iron, steel rails, or most of the vast body of commodities.

What was the extent of the power therefore of Congress to regulate considering the scope of regulation which government had the right to exert with reference to interstate commerce carriers when it came to exercise its legislative authority to regulate commerce? is the matter to be decided. That the business of common carriers by rail is in a sense a public business because of the interest of society in the continued operation and rightful conduct of such business and that the public interest begets a public right of regulation to the full extent necessary to secure and protect it, is settled by so many decisions, state and federal, and is illustrated by such a continuous exertion of state and federal legislative power as to leave no room for question on the subject. It is also equally true that as the right to fix by agreement between the carrier and its employees a standard of wages to control their relations is primarily private, the establishment and giving effect to such agreed on standard is not subject to be controlled or prevented by public authority. But taking all these propositions as undoubted, if the situation which we have described and with which the act of Congress dealt be taken into view, that is, the dispute between the employers and employees as to a standard of wages, their failure to agree, the resulting absence of such standard, the entire interruption of interstate commerce which was threatened,

and the infinite injury to the public interest which was imminent, it would seem inevitably to result that the power to regulate necessarily obtained and was subject to be applied to the extent necessary to provide a remedy for the situation, which included the power to deal with the dispute, to provide by appropriate action for a standard of wages to fill the want of one caused by the failure to exert the private right on the subject and to give effect by appropriate legislation to the regulations thus adopted. This must be unless it can be said that the right to so regulate as to save and protect the public interest did not apply to a case where the destruction of the public right was imminent as the result of a dispute between the parties and their consequent failure to establish by private agreement the standard of wages which was essential; in other words that the existence of the public right and the public power to preserve it was wholly under the control of the private right to establish a standard by agreement. Nor is it an answer to this view to suggest that the situation was one of emergency and that emergency cannot be made the source of power. *Ex parte Milligan*, 4 Wall. 2. The proposition begs the question, since although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed. If acts which, if done, would interrupt, if not destroy, interstate commerce may be by anticipation legislatively prevented, by the same token the power to regulate may be exercised to guard against the cessation of interstate commerce threatened by a failure of employers and employees to agree as to the standard of wages, such standard being an essential prerequisite to the uninterrupted flow of interstate commerce.

But passing this, let us come to briefly recapitulate some of the more important of the regulations which have been enacted in the past in order to show how necessarily the

exertion of the power to enact them manifests the existence of the legislative authority to ordain the regulation now before us, and how completely the whole system of regulations adopted in the past would be frustrated or rendered unavailing if the power to regulate under the conditions stated which was exerted by the act before us was not possessed. That regulation gives the authority to fix for interstate carriage a reasonable rate subject to the limitation that rights of private property may not be destroyed by establishing them on a confiscatory basis, is settled by long practice and decisions.[1] That the power to regulate also extends to many phases of the business of carriage and embraces the right to control the contract power of the carrier in so far as the public interest requires such limitation, has also been manifested by repeated acts of legislation as to bills of lading, tariffs and many other things too numerous to mention.[2] Equally certain is it that the power has been exercised so as to deal not only with the carrier, but with its servants and to regulate the relation of such servants not only with their employers, but between themselves.[3] Illustrations of the latter are afforded by the Hours of Service Act, the Safety Appliance Act and the Employers' Liability Act. Clear

---

[1] *Chicago, Burlington & Quincy R. R. Co.* v. *Iowa,* 94 U. S. 155, 161; *Stone* v. *Farmers' Loan & Trust Co.,* 116 U. S. 307; *Interstate Commerce Commission* v. *Chicago, Rock Island & Pacific Ry. Co.,* 218 U. S. 88; *Minnesota Rate Cases,* 230 U. S. 352.

[2] *New York, New Haven & Hartford R. R. Co.* v. *Interstate Commerce Commission,* 200 U. S. 361; *Atlantic Coast Line R. R. Co.* v. *Riverside Mills,* 219 U. S. 186; *Texas & Pacific Railway Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426; *Adams Express Co.* v. *Croninger,* 226 U. S. 491; *Boston & Maine Railroad* v. *Hooker,* 233 U. S. 97.

[3] *Johnson* v. *Southern Pacific Company,* 196 U. S. 1; *Employers' Liability Cases,* 207 U. S. 463; *Baltimore & Ohio R. R. Co.* v. *Interstate Commerce Commission,* 221 U. S. 612; *Southern Railway Co.* v. *United States,* 222 U. S. 20; *Second Employers' Liability Cases,* 223 U. S. 1.

also is it that an obligation rests upon a carrier to carry
on its business and that conditions of cost or other ob-
stacles afford no excuse and exempt from no responsibility
which arises from a failure to do so and also that govern-
ment possesses the full regulatory power to compel per-
formance of such duty.[1]

In the presence of this vast body of acknowledged
powers there would seem to be no ground for disputing
the power which was exercised in the act which is before
us so as to prescribe by law for the absence of a standard
of wages caused by the failure to exercise the private right
as a result of the dispute between the parties, that is, to
exert the legislative will for the purpose of settling the
dispute and bind both parties to the duty of acceptance
and compliance to the end that no individual dispute or
difference might bring ruin to the vast interests concerned
in the movement of interstate commerce, for the express
purpose of protecting and preserving which the plenary
legislative authority granted to Congress was reposed.
This result is further demonstrated, as we have suggested,
by considering how completely the purpose intended to be
accomplished by the regulations which have been adopted
in the past would be rendered unavailing or their enact-
ment inexplicable if the power was not possessed to meet
a situation like the one with which the statute dealt. What
would be the value of the right to a reasonable rate if all
movement in interstate commerce could be stopped as a
result of a mere dispute between the parties or their failure
to exert a primary private right concerning a matter of
interstate commerce? Again, what purpose would be
subserved by all the regulations established to secure the
enjoyment by the public of an efficient and reasonable
service, if there was no power in government to prevent

[1] *Atlantic Coast Line R. R. Co.* v. *North Carolina Corporation Com-
mission,* 206 U. S. 1, 26; *Missouri Pacific Railway* v. *Kansas,* 216 U. S.
262, 278.

all service from being destroyed? Further yet what benefits would flow to society by recognizing the right, because of the public interest, to regulate the relation of employer and employee and of the employees among themselves and to give to the latter peculiar and special rights safeguarding their persons, protecting them in case of accident and giving efficient remedies for that purpose, if there was no power to remedy a situation created by a dispute between employers and employees as to rate of wages, which if not remedied, would leave the public helpless, the whole people ruined and all the homes of the land submitted to a danger of the most serious character? And finally, to what derision would it not reduce the proposition that government had power to enforce the duty of operation, if that power did not extend to doing that which was essential to prevent operation from being completely stopped by filling the interregnum created by an absence of a conventional standard of wages because of a dispute on that subject between the employers and employees by a legislative standard binding on employers and employees for such a time as might be deemed by the legislature reasonably adequate to enable normal conditions to come about as the result of agreements as to wages between the parties?

We are of opinion that the reasons stated conclusively establish that from the point of view of inherent power the act which is before us was clearly within the legislative power of Congress to adopt, and that in substance and effect it amounted to an exertion of its authority under the circumstances disclosed to compulsorily arbitrate the dispute between the parties by establishing as to the subject matter of that dispute a legislative standard of wages operative and binding as a matter of law upon the parties,—a power none the less efficaciously exerted because exercised by direct legislative act instead of by the enactment of other and appropriate means providing for

the bringing about of such result. If it be conceded that the power to enact the statute was in effect the exercise of the right to fix wages where by reason of the dispute there had been a failure to fix by agreement, it would simply serve to show the nature and character of the regulation essential to protect the public right and safeguard the movement of interstate commerce, not involving any denial of the authority to adopt it.

And this leaves only to be generally considered whether the right to exercise such a power under the conditions which existed was limited or restrained by the private rights of the carriers or their employees.

(a) *As to the carrier.* As engaging in the business of interstate commerce carriage subjects the carrier to the lawful power of Congress to regulate irrespective of the source whence the carrier draws its existence, and as also by engaging in a business charged with a public interest all the vast property and every right of the carrier become subject to the authority to regulate possessed by Congress to the extent that regulation may be exerted considering the subject regulated and what is appropriate and relevant thereto, it follows that the very absence of the scale of wages by agreement and the impediment and destruction of interstate commerce which was threatened called for the appropriate and relevant remedy, the creation of a standard by operation of law binding upon the carrier.

(b) *As to the employee.* Here again it is obvious that what we have previously said is applicable and decisive, since whatever would be the right of an employee engaged in a private business to demand such wages as he desires, to leave the employment if he does not get them and by concert of action to agree with others to leave upon the same condition, such rights are necessarily subject to limitation when employment is accepted in a business charged with a public interest and as to which the power to regulate commerce possessed by Congress applied and the

resulting right to fix in case of disagreement and dispute a standard of wages as we have seen necessarily obtained.

In other words, considering comprehensively the situation of the employer and the employee in the light of the obligations arising from the public interest and of the work in which they are engaged and the degree of regulation which may be lawfully exerted by Congress as to that business, it must follow that the exercise of the lawful governmental right is controlling. This results from the considerations which we have previously pointed out and which we repeat, since conceding that from the point of view of the private right and private interest as contradistinguished from the public interest the power exists between the parties, the employers and employees, to agree as to a standard of wages free from legislative interference, that right in no way affects the lawmaking power to protect the public right and create a standard of wages resulting from a dispute as to wages and a failure therefore to establish by consent a standard. The capacity to exercise the private right free from legislative interference affords no ground for saying that legislative power does not exist to protect the public interest from the injury resulting from a failure to exercise the private right. In saying this of course it is always to be borne in mind that as to both carrier and employee the beneficent and ever-present safeguards of the Constitution are applicable and therefore both are protected against confiscation and against every act of arbitrary power which if given effect to would amount to a denial of due process or would be repugnant to any other constitutional right. And this emphasizes that there is no question here of purely private right since the law is concerned only with those who are engaged in a business charged with a public interest where the subject dealt with as to all the parties is one involved in that business and which we have seen comes under the control of the right to regulate to the extent that the power

to do so is appropriate or relevant to the business regulated.

Having thus adversely disposed of the contentions as to the inherent want of power, we come to consider all the other propositions which group themselves under a common heading, that is,

II. *Such an abuse of the power if possessed as rendered its exercise unconstitutional.*

We shall consider the various contentions which come under this heading under separate subdivisions.

(a) *Equal protection of the laws and penalties.*

The want of equality is based upon two considerations. The one is the exemption of certain short line and electric railroads. We dismiss it because it has been adversely disposed of by many previous decisions.[1] The second rests upon the charge that unlawful inequality results because the statute deals not with all, but only with the wages of employees engaged in the movement of trains. But such employees were those concerning whom the dispute as to wages existed growing out of which the threat of interruption of interstate commerce arose,—a consideration which establishes an adequate basis for the statutory classification.

As to the penalties it suffices to say that in this case a recovery of penalties is not asked and consequently the subject may well be postponed until it actually arises for decision.[2]

---

[1] *Dow* v. *Beidelman*, 125 U. S. 680; *Chicago, Rock Island & Pacific Ry. Co.* v. *Arkansas*, 219 U. S. 453; *Omaha & Council Bluffs Street Ry.* v. *Interstate Commerce Commission*, 230 U. S. 324; *Chesapeake & Ohio Ry. Co.* v. *Conley*, 230 U. S. 513, 522–524; *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Arkansas*, 240 U. S. 518.

[2] *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, 417; *Grenada Lumber Co.* v. *Mississippi*, 217 U. S. 433, 443; *Southwestern Oil Co.* v. *Texas*, 217 U. S. 114, 120; *Western Union Telegraph Co.* v. *Richmond*, 224 U. S. 160, 172; *Chesapeake & Ohio Ry. Co.* v. *Conley*, 230 U. S. 513, 522.

(b) *Want of due process resulting from the improvidence with which the statute was enacted and the impossibility in practice of giving effect to its provisions; in other words, as stated in the argument, its "unworkability."*

The contention virtually is that, conceding the legislative power under the circumstances stated to fix a standard of wages, such authority necessarily contemplates consideration before action and not a total and obvious disregard of every right of the employer and his property— a want of consideration and a disregard which, it is urged, appear on the face of the statute and which cause it therefore to amount to a decision without a hearing and to a mere arbitrary bestowal of millions by way of wages upon employees to the injury not only of the employer but of the public upon whom the burden must necessarily fall. Upon the assumption that unconstitutionality would result if there be ground for the propositions,[1] let us test them. In the first place, as we have seen, there is no room for question that it was the dispute between the parties, their failure to agree as to wages and the threatened disruption of interstate commerce caused by that dispute which was the subject which called for the exertion of the power to regulate commerce and which was dealt with by the exertion of that power which followed. In the second place, all the contentions as to want of consideration sustaining the action taken are disposed of by the history we have given of the events out of which the controversy grew, the public nature of the dispute, the interposition of the President, the call by him upon Congress for action in conjunction with the action taken, all demonstrating not unwitting action or a failure to consider, whatever may be the room, if any, for a divergence of opinion as to the want of wisdom shown by the action taken.

But to bring the subject to a closer analysis, let us briefly

---

[1] *McCray v. United States*, 195 U. S. 27, 63.

recall the situation, the conditions dealt with and the terms of the statute. What was the demand made by the employees? A permanent agreement as to wages by which the period should be shortened in which the fixed mileage task previously existing should be performed, an allowance to be made of extra pay by the minute at one and one-half times the regular pay for any overtime required to perform the task if it was not done in the reduced time, with a condition that no reduction in wages should occur from putting the demands into effect and also that in that event their operation should be binding upon the employers and optional on the employees. What was the real dispute? The employers insisted that this largely increased the pay because the allotted task would not be performed in the new and shorter time and a large increase for overtime would result. The employees on the other hand insisted that as the task would be unchanged and would be performed in the shorter hours, there would be no material, or at all events no inordinate, increase of pay. What did the statute do in settling these differences? It permanently applied an eight-hour standard for work and wages which existed and had been in practice on about fifteen per cent. of the railroads. It did not fix the amount of the task to be done during those hours, thus leaving that to the will of the parties. It yielded in part to the objections of the employers by permitting overtime only if "necessary" and it also absolutely rejected in favor of the employers and against the employees the demand for an increased rate of pay during overtime if there was any and confined it to the regular rate and it moreover rejected the option in favor of the employees by making the law obligatory upon both parties. In addition, by the provision prohibiting a lower rate of wages under the new system than was previously paid, it fixed the wages for such period. But this was not a permanent fixing, but in the nature of things a temporary one which left the will

of the employers and employees to control at the end of the period if their dispute had then ceased.

Considering the extreme contentions relied upon in the light of this situation we can discover no basis upon which they may rest. It certainly is not afforded because of the establishment of the eight-hour standard, since that standard was existing as we have said on about fifteen per cent. of the railroads, had already been established by act of Congress as a basis for work on government contracts, and had been upheld by this court in sustaining state legislation.[1] It certainly cannot. be said that the act took away from the parties, employers and employees, their private right to contract on the subject of a scale of wages since the power which the act exerted was only exercised because of the failure of the parties to agree and the resulting necessity for the lawmaking will to supply the standard rendered necessary by such failure of the parties to exercise their private right. Further, in view of the provisions of the act narrowing and limiting the demands made, the statute certainly affords no ground for the proposition that it arbitrarily considered only one side of the dispute to the absolute and total disregard of the rights of the other, since it is impossible to state the modifications which the statute made of the demands without by the very words of the statement manifesting that there was an exertion of legislative discretion and judgment in acting upon the dispute between the parties. How can this demonstration fail to result if it be stated that the scope of the task to be performed in the eight-hour period was not expressed but was left therefore to adjustment between the parties, that overtime was only permitted if "necessary," and that extra pay for

---

[1] *United States* v. *Martin,* 94 U. S. 400; *Holden* v. *Hardy,* 169 U. S. 366; *Ellis* v. *United States,* 206 U. S. 246; *United States* v. *Garbish,* 222 U. S. 257; *Miller* v. *Wilson,* 236 U. S. 373; *Bosley* v. *McLaughlin,* 236 U. S. 385.

overtime was rejected and regular rate of pay sub-
stituted?

Conceding that there would necessarily result from the
enforcement of the statute an increase of pay during the
period for which the statute forbade a reduction, such
concession would not bring the statute within the grounds
stated. The right to meet the situation caused by the
dispute and to fix a standard which should be binding
upon both parties included of course the legislative au-
thority to take into consideration the elements of dif-
ference and in giving heed to them all to express such
legislative judgment as was deemed best under the circum-
stances.

From this it also follows that there is no foundation for
the proposition that arbitrary action in total disregard of
the private rights concerned was taken because the right
to change or lower the wages was left to be provided for
by agreement between the parties after a reasonable period
which the statute fixed. This must be unless it can be
said that to afford an opportunity for the exertion of the
private right of agreement as to the standard of wages
was in conflict with such right.

When it is considered that no contention is made that
in any view the enforcement of the act would result in
confiscation, the misconception upon which all the prop-
ositions proceed becomes apparent. Indeed in seeking
to test the arguments by which the propositions are sought
to be supported we are of opinion that it is evident that
in substance they assert not that no legislative judgment
was exercised, but that in enacting the statute there was an
unwise exertion of legislative power begotten either from
some misconception or some mistaken economic view or
partiality for the rights of one disputant over the other
or some unstated motive which should not have been
permitted to influence action. But to state such consider-
ations is to state also the entire want of judicial power to

consider them,—a view which therefore has excluded them absolutely from our mind and which impels us as a duty to say that we have not in the slightest degree passed upon them. While it is a truism to say that the duty to enforce the Constitution is paramount and abiding, it is also true that the very highest of judicial duties is to give effect to the legislative will and in doing so to scrupulously abstain from permitting subjects which are exclusively within the field of legislative discretion to influence our opinion or to control judgment.

Finally we say that the contention that the act was void and could not be made operative because of the unworkability of its provisions is without merit, since we see no reason to doubt that if the standard fixed by the act were made applicable and a candid effort followed to carry it out, the result would be without difficulty accomplished. It is true that it might follow that in some cases because of particular terms of employment or exceptional surroundings some change might be necessary, but these exceptions afford no ground for holding the act void because its provisions are not susceptible in practice of being carried out.

Being of the opinion that Congress had the power to adopt the act in question, whether it be viewed as a direct fixing of wages to meet the absence of a standard on that subject resulting from the dispute between the parties or as the exertion by Congress of the power which it undoubtedly possessed to provide by appropriate legislation for compulsory arbitration—a power which inevitably resulted from its authority to protect interstate commerce in dealing with a situation like that which was before it—we conclude that the court below erred in holding the statute was not within the power of Congress to enact and in restraining its enforcement and its decree therefore must be and it is reversed and the cause remanded with directions to dismiss the bill.

*And it is so ordered.*

Mr. Justice McKenna, concurring.

It is the contention of the Government that the act is an hours-of-service law, the intent of Congress being by its enactment "to proclaim a substantial eight-hour day." The opposing contention is that "the language of the act shows that it deals solely with the construction of contracts and with the standard and amount of compensation, and not with any limitation upon the hours of labor."

Upon these opposing contentions the parties respectively assert and deny the power of Congress to enact the law. The Government, however, further contends that, even viewing the law as a wage law, Congress under the commerce clause had power to pass it.

My purpose is to deal with the meaning of the act. With the consideration of the power to pass it I am satisfied with the opinion.

The title of the act (and to the title of an act we may resort to resolve ambiguity or to confirm its words) expresses its purpose to be "to establish an eight-hour day for employees of carriers engaged in interstate and foreign commerce, and for other purposes."

The description of the title was repeated in the House of Representatives by the chairman of the committee who reported the bill and from whom it has received its designation. Among other things, he said: "The law fixes an eight-hour day. We had previously a sixteen-hour day and a nine-hour day. We now have an eight-hour day. The only reference to wages is in the language used to hold in statu quo until the workings of the eight-hour law could be observed and all other features of the service adjusted to the eight-hour law." Explanations of like import were made in the Senate.

The words of the act, I think, support this characterization and it may be assumed were accepted by Congress as expressing and securing it; and I think they do so with

fair directness. Whatever involution there may be in them was caused by the situation to which they were addressed, derangement of which was sought to be avoided, the situation indeed made use of, "features of the service adjusted" to the law.

The provision of § 1 is: "That, beginning January first, nineteen hundred and seventeen, eight hours shall, in contracts for labor and service, be deemed a day's work and the measure or standard of a day's work for the purpose of reckoning the compensation for services of all employees who are now or may hereafter be employed by any common carrier by railroad, except . . . "

Nothing is fixed but the time of service—the hours which shall be deemed a day's work—the number to be eight. All else—compensation and conditions—is left to contract; only, whatever the compensation, it shall be for a service of eight hours reckoned (computed) or measured by such time as its determining factor. Except as so determined the compensation may be whatever the carriers and employees may agree upon. Their power of convention has no other limitation.

The distinction between what is left to the parties and what is fixed by the law is real. There is certainly a difference between the prescription of the time of service and the prescription of compensation for the service, and the difference is observed in the speech and conduct of men; it is observed in the regulations of legislation. It has never been supposed that the agitation for an eight-hour day for labor or the legislation which has responded to it, was intended to fix or did fix the rate of wages to be paid.

Of course, in a sense, the two things are related. The time of service and the price of service may be said to be the reciprocals of each other—each the price of the other. There can be no real estimate of the wages one receives until it is understood what time one has worked to receive

them. They rise and fall with the increase or decrease of the time of service. One who works ten hours a day for $5.00 may be said to get less than one who works eight hours for the same sum. The labor of the latter is of greater value to him than the labor of the ten-hour man is to him. And, correspondingly, the expense to the employer is greater in the one case than in the other, though the wages he pays, expressed in terms of money, are the same. It may be contended that there is no element, therefore, in the regulation of the price of labor that there is not in the regulation of the hours of labor. But, as I have said, in the practice of men and in the examples of legislation, regulation of one is not regarded as the regulation of the other. In certain hazardous employments the hours of labor have been prescribed. It has not been supposed, certainly not declared, that the power as exerted was the regulation of wages. The interest of the State has been assumed to terminate with the hours of service, and its compensation, therefore, has been left to the agreement of the parties.

As examples of legislation I may adduce *Holden* v. *Hardy*, 169 U. S. 366, where a state law was sustained, and *Baltimore & Ohio R. R. Co.* v. *Interstate Commerce Commission*, 221 U. S. 612, where a law of Congress was sustained. Both laws limited the hours of service, but neither the rate of wages. There may be also cited *Ellis* v. *United States*, 206 U. S. 246; *Muller* v. *Oregon*, 208 U. S. 412; *Bosley* v. *McLaughlin*, 236 U. S. 385; *Miller* v. *Wilson*, 236 U. S. 373.

It may be contended that the power that can limit the hours of service can fix the wages for the service. To this I shall presently refer. My immediate purpose is the interpretation of the law under review, and I have only to point out that it is the sense of the practical world that prescribing the hours of labor is not prescribing the wages of labor, and Congress has kept the purposes distinct.

I do not think that other provisions of the act militate against these views.  Section 2 provides for the appointment of a commission to observe the operation of the law, and this for the reason I have expressed of the dependence of the cost of the services upon the time they are rendered.  The shorter hours may or may not involve an increase of expense to the roads and may or may not require recompense by an increase of their rates.

Pending the report of the commission and for thirty days thereafter it is provided (§ 3) that compensation shall not be reduced below the present standard day's wage, and for all necessary time in excess of eight hours employees shall be paid at a rate not less than the *pro rata* rate for such standard eight-hour work day.

In a sense, this may be considered as a prescription of wages.  To those roads (85%) that have a ten-hour standard the provision, so far as applicable, may be said to be a change of compensation.  To those (15%) having an eight-hour standard it is not a change.  The effort of the law is to secure an eight-hour day service and the "penalty of payment for overtime service," to quote the Government's brief, "is imposed in order to enforce obedience to the eight-hour provision, as far as practicable."

But even if § 3 be given a broader effect it would not give character to the whole act and make it the exertion of power to establish permanently a rate of wages.  To so consider it would, I think, be contrary to the intention of Congress and convert the expediency for a particular occasion and condition into the rule for all occasions and conditions.

So far as the fate of the pending appeal is concerned, it is not of much importance whether the act be held to be an hours-of-service law or a wage-regulating law; but one may be regarded as having consequences that the other has not.  To a carrier a wage law is but an item in its accounts, and requiring, it may be, an adjustment of its

operations, the expense to be recompensed through its rates. If it be said that rates cannot be changed at will but only by permission of authority, I cannot think that permission will not be given if it be necessary to fulfill the command of the law. Indeed, if not given, the law might encounter constitutional restriction.

To an employee a wage law may be of more vital consequence, be of the very essence of his life, involving factors—many and various—which he alone can know and estimate, and which, besides, might not have an enduring constancy and be submissive to a precedent judgment. There well might be hesitation to displace him and substitute the determination of the law for his action.

I speak only of intention; of the power I have no doubt. When one enters into interstate commerce one enters into a service in which the public has an interest and subjects one's self to its behests. And this is no limitation of liberty; it is the consequence of liberty exercised, the obligation of his undertaking, and constrains no more than any contract constrains. The obligation of a contract is the law under which it is made and submission to regulation is the condition which attaches to one who enters into or accepts employment in a business in which the public has an interest.

I concur in the answer of the opinion to the contentions of inequality of the law and the deprivation to the carriers of due process.

Mr. Justice Day, dissenting.

I am unable to agree with the opinion and judgment just pronounced. The very serious constitutional questions involved seem to warrant a statement of the reasons which constrain me to this action.

I am not prepared to deny to Congress, in view of its constitutional authority to regulate commerce among the

States, the right to fix by lawful enactment the wages to be paid to those engaged in such commerce in the operation of trains carrying passengers and freight. While the railroads of the country are privately owned, they are engaged in a public service, and because of that fact are subject in a large measure to governmental control.

The regulatory power of Congress under the commerce clause of the Constitution is of a broad nature, but is subject to the applicable limitations of the Constitution.

I agree that upon the reasoning which sustained the power of Congress to regulate the hours of service of employees, and the degree of care which employers must observe to protect the safety of those engaged in the service and in view of the enactments which are held to be lawful regulations of interstate transportation, Congress has the power to fix the amount of compensation necessary to secure a proper service and to insure reasonable rates to the public upon the part of the railroads engaged in such traffic. While this much must necessarily follow from the constitutional authority of Congress, in the light of the interpretation given to the commerce clause in decisions of this court, it is equally true that this regulatory power is subject to any applicable constitutional limitations. This power cannot, any more than others conferred by the Constitution, be the subject of lawful exercise when such exertion of authority violates fundamental rights secured by the Constitution. *Gibbons* v. *Ogden,* 9 Wheat. 1, 196; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 336; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505, 571; *Lottery Case,* 188 U. S. 321, 353.

The power to legislate, as well as other powers conferred by the Constitution upon the coördinate branches of the Government, is limited by the provisions of the Fifth Amendment of the Constitution preventing deprivation of life, liberty, or property without due process of law.

The phrase "Due Process of Law" has been the subject

of much discussion, and while its precise definition has not
been attempted, and its limitations have been left to the
gradual process of inclusion and exclusion, the binding
force of its requirements is always conceded, and has been
frequently enforced in cases as they have arisen.  If the
Constitution is not to become a dead letter the protection
of the due process clause must be given to all entitled to
this safeguard of rights which the Amendment intended
to secure.  The due process clause restrains alike every
branch of the Government, and is binding upon all who
exercise federal power, whether of an executive, legislative,
or judicial character.  It withholds from the executive
the exercise of arbitrary authority, it prevents the judi-
ciary from condemning one in his person or property with-
out orderly methods of procedure adapted to the situa-
tion, and opportunity to be heard before judgment.  We
are now immediately concerned with its effect upon the
exercise of legislative authority.

While every case must depend upon its peculiar cir-
cumstances, certain general principles are well settled;
perhaps they have not been better stated than in the words
of Mr. Justice Matthews, speaking for this court in *Hur-
tado* v. *California*, 110 U. S. 516, 531, wherein he said:
"The concessions of Magna Charta were wrung from the
King as guaranties against the oppressions and usurpations
of his prerogative.  It did not enter into the minds of the
barons to provide security against their own body or in
favor of the Commons by limiting the power of Parliament;
so that bills of attainder, *ex post facto* laws, laws declaring
forfeitures of estates, and other arbitrary acts of legisla-
tion which occur so frequently in English history, were
never regarded as inconsistent with the law of the
land.  . . .  The actual and practical security for Eng-
lish liberty against legislative tyranny was the power of a
free public opinion represented by the Commons.  In this
country written constitutions were deemed essential to

protect the rights and liberties of the people against the encroachments of power delegated to their governments, and the provisions of Magna Charta were incorporated into Bills of Rights. They were limitations upon all the powers of government, legislative as well as executive and judicial. . . . Applied in England only as guards against executive usurpation and tyranny, here they have become also bulwarks against arbitrary legislation." See *Murray's Lessee* v. *Hoboken Land and Improvement Co.*, 18 How. 272; *Bank of Columbia* v. *Okely*, 4 Wheat. 235; 2 Story on the Constitution, 4th ed., § 1944; Cooley on the Constitution, 241 *et seq.*; McGehee on Due Process of Law, p. 22 *et seq.*, and the illuminating discussion of the subject by Mr. Justice Moody in *Twining* v. *New Jersey*, 211 U. S. 78.

It results from the principles which have been enforced in this court, and recognized by writers of authority, that due process of law, when applied to the legislative branch of the Government, will not permit Congress to make anything due process of law which it sees fit to declare such by the mere enactment of the statute; if this were true, life, liberty, or property might be taken by the terms of the legislative act, depending for its authority upon the will or caprice of the legislature, and constitutional provisions would thus become a mere nullity. See the frequently quoted argument of Mr. Webster in the *Dartmouth College Case*, 4 Wheat. 518; *Davidson* v. *New Orleans*, 96 U. S. 97; *Chicago, Burlington & Quincy R. R. Co.* v. *Chicago*, 166 U. S. 226; McGehee on Due Process of Law, p. 30.

The underlying principle of the decisions which have constrained this court in rare instances to exercise its constitutional right to declare congressional enactments void, is the protection intended to be afforded against legislation of an arbitrary character.

While it is true, as stated in the majority opinion, that it is the duty of courts to enforce lawful legislative enact-

ments of Congress, it is equally their duty and sworn obligation when differences between acts of the legislature and the guaranties of the Federal Constitution arise, to govern their decisions by the provisions of that instrument which represents the will of all the people, and under the authority of which every branch of the Government is enabled to discharge the duty imposed upon it.

The act in question must be brought to the test of these fundamental principles, and if found to be violative of the Federal Constitution it must be declared void. Grave and important as the duty is it cannot be avoided consistently with the obligations imposed by the Constitution upon every branch of the judiciary, federal and state, and particularly upon this court, to which under our system is entrusted the ultimate decision of questions of this nature.

Applying these principles, in my opinion this act cannot successfully withstand the attack that is made upon it as an arbitrary and unlawful exertion of supposed legislative power. It is not an act limiting the hours of service. Nor is it, in my judgment, a legitimate enactment fixing the wages of employées engaged in such service. In one of its most important aspects, and in view of the mandatory provisions of § 3 of the act, it is one the effect of which is to increase the wages of certain employees in interstate commerce by the requirement that pending investigation, the wages which have theretofore been paid for ten hours' service shall be given for eight hours' service of the same character. The increase of wages is to be in force only during the period of observation provided in the act. Before the passage of this enactment the wages of the character involved herein had been fixed by agreement, or determined by arbitration between the parties concerned. By this enactment the wage theretofore paid for a ten-hours' service is required to be paid for an eight-hours' service pending the investigation provided for in other parts of the law. In other words, Congress upon the face

of the enactment expresses its inability to fix in advance of investigation a just and proper wage for the employees concerned. It inevitably follows that the cost of the experiment, measured by the increase in wages amounting, it is stated, to many millions of dollars, and certain to cost a very large sum, must be paid, not by the public, nor be equally borne by the contracting parties, but by legislative edict is made to fall entirely upon one of the parties, with no provision for compensation should the subsequent investigation establish the injustice or impropriety of the temporary increase.

An examination of the history of the legislation, and public documents submitted for our consideration, amply support this conclusion. In submitting the matter to Congress the President recommended: "Explicit approval by the Congress of the consideration by the Interstate Commerce Commission of an increase of freight rates to meet such additional expenditures by the railroads as may have been rendered necessary by the adoption of the eight-hour day and which have not been offset by administrative readjustments and economies, should the facts disclosed justify the increase."

This recommendation was not followed in the enactment of the statute. The Senate Committee having the subject under consideration expressed a desire for investigation and consideration before enacting a law of this character. Such was not had, and the law in its present form was speedily passed.

In fixing wages, conceding the power of Congress for this purpose, that body acts having in mind the rights of the public, of the owners of railroads, and of the employees engaged in their service. Inherently, such legislation requires that investigation and deliberation shall precede action. In fixing rates Congress has itself recognized this principle and has delegated its power to a Commission which acts only upon full investigation, and an oppor-

tunity to be heard, wherein the interest of the public, the carrier, and the shipper may be given ample consideration.

Conceding that every presumption exists in favor of the legitimate exercise of legislative power, and that there is no authority in the courts to inquire into the motives which may have influenced legislators, and that every such enactment presupposes the possession of proper motives and sufficient information and knowledge to warrant the action taken, nevertheless Congress has in this act itself declared the lack of the requisite information for definite action, and has directed an experiment to determine what it should do, imposing in the meantime an increase of wages peremptorily declared, the expense of which is to be borne entirely by the carrier, without recompense if the investigation proves the injustice or impropriety of the increase.

Such legislation, it seems to me, amounts to the taking of the property of one and giving it to another in violation of the spirit of fair play and equal right which the Constitution intended to secure in the due process clause to all coming within its protection, and is a striking illustration of that method which has always been deemed to be the plainest illustration of arbitrary action, the taking of the property of A and giving it to B by legislative fiat. *Davidson* v. *New Orleans,* 96 U. S. 97, 104.

It may be taken to be true, as stated in the majority opinion, that but for this legislation a strike of employees engaged in interstate commerce would have been precipitated, disastrous in its consequences to the commerce of the country.

If I am right in the conclusion that this legislation amounted to a deprivation of property without due process of law, no emergency and no consequence, whatever their character, could justify the violation of constitutional rights. The argument of justification by emergency was made and answered in this court in *Ex parte Milligan,*

4 Wall. 2, decided more than fifty years ago, in which it was held that not even the perils of war could impair the right of a resident of a loyal State, not connected with the military service, and where the courts were open, and in the proper exercise of their jurisdiction, to be tried, convicted, or sentenced only by the ordinary courts of law, with trial by jury and with the safeguards intended to secure a fair trial in the courts of law. Speaking of the purposes which controlled in the adoption of the Federal Constitution, and animated those who framed that instrument this court said, p. 120: "Those great and good men foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority."

This principle is equally applicable to-day. Constitutional protection is more essential in times of unrest and agitation than it can be in the security of less turbulent periods. The Constitution intended to protect the citizen

against encroachments upon his rights impelled by existing emergencies, or supposed necessity of prompt and vigorous action. Constitutional rights, if they are to be available in time of greatest need, cannot give way to an emergency, however immediate, or justify the sacrifice of private rights secured by the Constitution.

I agree that a situation, such as was presented to Congress at this time, properly called for the exertion of its proper authority to avert impending calamity. I cannot agree that constitutional rights may be sacrificed because of public necessity, nor taken away because of emergencies which might result in disaster or inconvenience to public or private interests. If this be not so, the constitutional limitations for the protection of life, liberty, and property, are of little value, and may be taken away whenever it is supposed that the public interests will be promoted by the sacrifice of rights which the framers of the Constitution intended should be forever protected from governmental invasion by any branch of the Government.

There are certain matters in the opinion of the majority which I am unable to approve by silent acquiescence. I am not prepared to admit that Congress may when deemed necessary for the public interest coerce employees against their will to continue in service in interstate commerce. Nor do I think it necessary to decide, as declared in the majority opinion, that in matters of this kind Congress can enact a compulsory arbitration law. These questions are not involved in this case and their decision need not be anticipated until they actually arise.

The reasons, which I have outlined, impel me to the conclusion that the enactment under consideration necessarily deprives the complaining railroad companies of rights secured to them, as well as to others, by one of the most essential of the protections guaranteed by the Federal Constitution. In this view I am constrained to dissent from the opinion and judgment in this case.

MR. JUSTICE PITNEY, dissenting.

I am constrained to dissent from the decision just announced and from the reasoning upon which it is based. I am convinced that the statute under consideration (Act of September 3, 5, 1916, c. 436, 39 Stat. 721) is not within the constitutional power of Congress. The infirmity that I find in it is so fundamental that, for the sake of brevity, I lay aside all minor grounds upon which it is attacked, and hence may begin by setting forth the title and essential provisions of the act, so as to render plain its true effect and operation, omitting portions not necessary to a consideration of the main questions. I quote as follows:

"An Act To establish an eight-hour day for employees of carriers engaged in interstate and foreign commerce, and for other purposes.

"*Be it enacted* . . . That beginning January first, nineteen hundred and seventeen, eight hours shall, in contracts for labor and service, be deemed a day's work and the measure or standard of a day's work for the purpose of reckoning the compensation for services of all employees who are now or may hereafter be employed by any common carrier by railroad, . . . which is subject to the provisions of the Act of February fourth, eighteen hundred and eighty-seven, entitled 'An Act to regulate commerce,' as amended, and who are now or may hereafter be actually engaged in any capacity in the operation of trains used for the transportation of persons or property on railroads, . . . from any State or Territory of the United States or the District of Columbia to any other State or Territory of the United States or the District of Columbia," etc.

"Sec. 2. That the President shall appoint a commission of three, which shall observe the operation and effects of the institution of the eight-hour standard workday as above defined and the facts and conditions affecting the

relations between such common carriers and employees during a period of not less than six months nor more than nine months, in the discretion of the commission, and within thirty days thereafter such commission shall report its findings to the President and Congress;  .   .   .

"Sec. 3. That pending the report of the commission herein provided for and for a period of thirty days thereafter the compensation of railway employees subject to this Act for a standard eight-hour workday shall not be reduced below the present standard day's wage, and for all necessary time in excess of eight hours such employees shall be paid at a rate not less than the pro rata rate for such standard eight-hour workday.

"Sec. 4. That any person violating any provision of this Act shall be guilty of a misdemeanor," etc.

It is, I think, too plain for argument that the act departs from its title, in that it does not establish eight hours as the limit of a day's work. There is no prohibition of service in excess of eight hours per day, nor any penalty for overtime work, for this is to be paid for only *pro rata*. There is no language evincing an intent to repeal or modify the Sixteen Hour Act of March 4, 1907, c. 2939, 34 Stat. 1415. It is a matter of common knowledge that railroad train service must be arranged according to the distances between terminals or "division points," and a change from a sixteen-hour limit to an eight-hour limit would be so revolutionary that a purpose to make such a change is not to be lightly inferred. This act affords no basis for such an inference. What it prescribes is that "eight hours shall, *in contracts for labor and service*, be deemed a day's work and *the measure or standard* of a day's work *for the purpose of reckoning the compensation* for services." It defines the terms of contracts for service and prescribes a measure only for the purpose of reckoning compensation. This is the whole effect of the first section. To shorten the discussion, I will concede, *arguendo*, that

this section of itself is not in conflict with the Constitution. This being assumed, the second section evidently is unexceptionable.

Serious difficulty appears, however, when we come to consider the operation and effect of the third section in connection with the first and second. It provides that, pending the report of the commission, and for thirty days thereafter, "the compensation of railway employees subject to this Act for a standard eight-hour workday shall not be reduced below the present standard day's wage," etc. This, of course, is to be practically enforced by means of prosecutions under § 4. The "present standard day's wage," in effect upon the railroad represented by appellees in this case and upon most of the other railroads of the country, is a term not easily defined. Accepting the paraphrase employed in the brief for the United States, the standard may be expressed as follows: "One hundred miles or less, ten hours or less, shall constitute a day." The effect of § 3 is that during a period of from seven to eleven months the carriers shall pay as much for eight hours' work as previously was paid for ten hours' work; the excess over eight hours to be paid for *pro rata* on the eight-hour basis. The effect is to increase wages in a large but undefined amount upon the railroad represented in this suit, and in the amount of many millions of dollars considering all the railroads that are affected.

The legislation is attempted to be sustained solely as an exercise of the power of Congress to regulate interstate and foreign commerce. Evidently it can find no other support, for Congress has no authority over the Missouri, Oklahoma & Gulf Railway Company, whose receivers are appellees here, or over the other companies affected by this law, except by reason of its power to regulate commerce; and it possesses this authority only because those corporations voluntarily have chosen to engage in commerce among the States. A contention that Congress

has power to compel the railroads and their employees to continue to carry on such commerce at all costs will be dealt with hereafter.

If, therefore, the act be not in a real and substantial sense a regulation of commerce, it is in excess of the constitutional power of Congress. "Manifestly, any rule prescribed for the conduct of interstate commerce, in order to be within the competency of Congress under its power to regulate commerce among the States, must have some real or substantial relation to or connection with the commerce regulated." *Adair* v. *United States*, 208. U. S. 161, 178. And, though it be a regulation of commerce, it is void if it conflicts with the provisions of the Fifth Amendment, that no person shall be "deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 336; *United States* v. *Lynah*, 188 U. S. 445, 471; *Adair* v. *United States*, 208 U. S. 161, 180; *United States* v. *Cress*, decided March 12, 1917, *ante*, 316.

I am convinced, in the first place, that the act cannot be sustained as a regulation of commerce, because it has no such object, operation, or effect. It removes no impediment or obstruction from the way of traffic or intercourse, prescribes no service to the public, lays down no rule respecting the mode in which service is to be performed, or the safeguards to be placed about it, or the qualifications or conduct of those who are to perform it. In short, it has no substantial relation to or connection with commerce—no closer relation than has the price which the carrier pays for its engines and cars or for the coal used in propelling them.

The suggestion that it was passed to prevent a threatened strike, and in this sense to remove an obstruction from the path of commerce, while true in fact is immaterial in law. It amounts to no more than saying that it was

enacted to take care of an emergency. But an emergency can neither create a power nor excuse a defiance of the limitations upon the powers of the Government. *Ex parte Milligan,* 4 Wall. 2, 121.

The simple effect of § 3 is to increase, during the period of its operation, the rate of wages of railroad trainmen employed in interstate commerce. It comes to this,— that whereas the owners of the railroads have devoted their property to the movement of interstate as well as intrastate commerce, and whereas the trainmen have accepted employment in such commerce, and thus employers and employees are engaged together in a *quasi* public service, the act steps in and prescribes how the money earned in the public service shall be divided between the owners of the railroads and these particular employees. This, in my view, is a regulation not of commerce but of the internal affairs of the commerce carriers,—precisely as if an act were to provide that the rate of interest payable to the bondholders must be increased and the dividend payments to the stockholders correspondingly decreased—and is not only without support in the commerce clause of the Constitution, but, as I shall endeavor to show, transgresses the limitations of the Fifth Amendment.

The oft-quoted declaration of Chief Justice Marshall in *Gibbons* v. *Ogden,* 9 Wheat. 1, 196, that the power to regulate commerce among the States, like all others vested in Congress, "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution," means that the exercise of the power is not dependent on, and is not to be hampered by, the action of the States, and is unrestrained by any qualification other than such as are contained in the fundamental law. To say that the power "acknowledges no limitations" is not to say that it is limitless in extent, for it is confined by the very definition of the subject matter. The power is vast, but is not vague, and

error inevitably must result from treating it as nebulous.

The act stands wholly without precedent in either state or national legislation. Let it be admitted that mere novelty is not a ground of constitutional objection, since it is the appropriate function of a legislature to change the law. This act, however, differs not only in degree, but in kind, from any and all that have preceded it. It is now nearly thirty years since Congress entered the field of direct regulation of interstate railway carriers. Before that the entire field was open to the States, and since the year 1887 the regulation of their internal commerce has still remained open to them. This has been a period of intense and widespread activity and progress in commerce regulation, and, as it happens, of equal progress respecting legislation in the interest of workingmen. The fact that no law fixing the rate of compensation for railroad employees ever was proposed until this act was brought forward a very few days before its passage, and then only under the coercive influence of a threatened public calamity, is the strongest evidence that in the judgment of executives and legislators, state and national, measures of this sort were not within the bounds of permissible regulation of commerce.

As already stated, the act has not the effect of imposing any limit to the number of hours that a trainman may work in a day, nor any penalty for overtime work. Therefore, it cannot be sustained upon the ground on which the court sustained the Act of March 4, 1907, 34 Stat. 1415, c. 2939, limiting the hours of service of employees engaged in interstate commerce, a ground epitomized in *Baltimore & Ohio R. R.* v. *Interstate Com. Comm.*, 221 U. S. 612, 619, as follows: "The length of hours of service has direct relation to the efficiency of the human agencies upon which protection to life and property necessarily depends. . . In its power suitably to provide for the safety of employés

and travelers, Congress was not limited to the enactment of laws relating to mechanical appliances, but it was also competent to consider, and to endeavor to reduce, the dangers incident to the strain of excessive hours of duty on the part of engineers, conductors, train dispatchers, telegraphers, and other persons embraced within the class defined by the act."

The Safety Appliance Acts are as evidently distinguishable, they likewise being designed to secure the safety of employees and travelers, as this court repeatedly has held. *Johnson* v. *Southern Pacific Co.*, 196 U. S. 1, 17; *Southern Ry. Co.* v. *United States*, 222 U. S. 20, 26; *Texas & Pacific Ry. Co.* v. *Rigsby*, 241 U. S. 33, 41.

Nor does the Federal Employers' Liability Act of April 22, 1908, 35 Stat. 65, c. 149, furnish a precedent for the present legislation. The constitutionality of that act was sustained in *Second Employers' Liability Cases*, 223 U. S. 1, upon grounds very clearly set forth in the opinion, thus (p. 48): "Congress, in the exertion of its power over interstate commerce, may regulate the relations of common carriers by railroad and their employés, while both are engaged in such commerce, subject always to the limitations prescribed in the Constitution, and to the qualification that the particulars in which those relations are regulated must have a real or substantial connection with the interstate commerce in which the carriers and their employés are engaged"; and again (pp. 50–51): "The natural tendency of the changes described is to impel the carriers to avoid or prevent the negligent acts and omissions which are made the bases of the rights of recovery which the statute creates and defines; and, as whatever makes for that end tends to promote the safety of the employés and to advance the commerce in which they are engaged, we entertain no doubt that in making those changes Congress acted within the limits of the discretion confided to it by the Constitution."

Progressive as has been the legislation of Congress and

the States enacted during the past thirty years for the
regulation of common carriers, I have found none at all
analogous to that now under consideration.   Besides
the acts already referred to, laws have been passed re-
specting tariffs, bills of lading, through routes, joint rates,
the  exchange  of  traffic,  terminal  charges,  locomotive
headlights, and a multitude of other matters; but each and
all of these have some direct and substantial relation to
commerce itself.

The suggestion that an increase in the wages of train-
men, will increase their contentment, encourage prompt
and efficient service, and thus facilitate the movement of
commerce, is altogether fanciful.   The increase effected
is not at all conditioned upon contented or efficient serv-
ice.   It benefits alike those who are efficient and those
who are not.   It does not equalize wages, but applies
proportionately in all cases; making the least increase
upon railroads whose rates of pay are the lowest, the great-
est where wages are the highest.   As a measure for im-
proving the quality of railroad locomotives, a law requir-
ing the companies to pay 25% more than before for each
locomotive, without stipulating for any improvement in
the quality, would be absurdly ineffective.   Equally futile,
as a measure for improvement of the quality of railway
supplies, would be a provision of law compelling the roads
to pay 25% more than formerly for rails, crossties, fuel,
and the like, irrespective of the question of quality.   In
each of these instances the natural effect of the regulation
as an aid to commerce would be precisely the same as that
of the act under consideration—that is, *nil*.

The attempt is made to sustain the act as analogous
to the exercise of the power to fix rates of freight and fare
for the carriage of commodities and passengers, or as a
branch of that power.   This, in my judgment, is a false
analogy.   The origin and basis of the governmental power
to regulate rates are in the right of the public to demand

and secure the services of the common carrier on reasonable and equal terms, and without haggling as to rates or other terms. Every member of the public is entitled to be served, and rates are established by public authority in order to protect the public against oppression and discrimination. But there is no common or other right on the part of the trainmen to demand employment from the carriers, nor any right on the part of the carriers to compel the trainmen to serve them. The employment is a matter of private bargaining between the parties, in which each has a constitutional right to exact such terms as he may deem proper. *Adair* v. *United States*, 208 U. S. 161, 172–3; *Coppage* v. *Kansas*, 236 U. S. 1, 20. Thus the sole foundation of the governmental power to fix rates is absent in the case of wages, and the asserted power to fix the latter is inconsistent with the constitutional rights of employer and employee to agree between themselves respecting the terms of the employment.

But further, the interest of the public in the regulation of rates lies in limiting the carrier to a reasonable compensation for his services. Incidentally, such a regulation may exert an indirect influence upon wages, as upon other expenditures of the carrier. Thus, the Interstate Commerce Commission has held that undue cost of operation or management cannot stand as a justification for unreasonably high rates. *Milk Producers' Protective Association* v. *Delaware, L. & W. R. R. Co.*, 7 I. C. C. 92, 164; *Society of American Florists* v. *U. S. Express Co.*, 12 I. C. C. 120, 127. But whatever concern the public authorities, as regulators of commerce, have in the cost of operation or management (including the rates of wages) is in the direction of lowering—not increasing—expenses. The present act has for its purpose and necessary effect the raising of wages; and, whatever may be its justification from the humanitarian standpoint, it cannot seriously be regarded as a regulation of commerce because incidental to a regula-

tion of rates.  It is, indeed, the very antithesis of such a regulation.  If it reduced wages, it would be much more easily supportable on this theory.

The primary and fundamental constitutional defect that I find in the act now under consideration is precisely this: That it undertakes to regulate the relations of common carriers by railroad to their employees in respect to a particular matter—an increase of wages—that has no real and substantial connection with the interstate commerce in which the carriers and their employees are engaged.  Certainly the amount of wages that shall be paid to a trainman has no more substantial relation to commerce than the matter which was under consideration in *Adair* v. *United States*, 208 U. S. 161, that is, the right of an employee to retain his employment notwithstanding his membership in a labor organization.  In that case this court, by Mr. Justice Harlan, used the following language (p. 178): "But what possible legal or logical connection is there between an employé's membership in a labor organization and the carrying on of interstate commerce? Such relation to a labor organization cannot have, *in itself* and in the eye of the law, any bearing upon the commerce with which the employé is connected by his labor and services."

It proves nothing to say that the increase of pay was or is necessary, in the judgment of Congress, to prevent all railroad service in interstate commerce from being suspended.  As a law to prevent a strike, the act is quite intelligible; but, as we have seen, the emergency conferred no power upon Congress to impose the burden upon the carriers.  If the public exigency required it, Congress perhaps might have appropriated public moneys to satisfy the demands of the trainmen.  But there is no argument for requiring the carriers to pay the cost, that would not equally apply to renewed demands, as often as made, if made by men who had the power to tie up traffic.  I cannot

believe that this is regulation of commerce, within the meaning of the Constitution.

But, secondly, as already remarked, and as shown in the above quotation from 223 U. S. p. 49, the power of Congress to regulate commerce among the States is "subject always to the limitations prescribed in the Constitution," and, among others, to the inhibition of the Fifth Amendment against the deprivation of liberty or property without due process of law and the taking of private property for public use without just compensation. This has been held so often that it hardly is necessary to cite cases. *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 336; *United States* v. *Lynah*, 188 U. S. 445, 471; *Adair* v. *United States*, 208 U. S. 161, 180; *United States* v. *Cress*, decided March 12, 1917, *ante*, 316.

I am convinced that the act trangresses this provision of the Amendment in two respects; first, in that it exceeds the bounds of proper regulation, and deprives the owners of the railroads of their fundamental rights of liberty and property; and, secondly, in that Congress, although confessedly not in possession of the information necessary for intelligent and just treatment of the pending controversy between the carriers and the trainmen (for the act itself, in its second section, provides for the very investigation that the history of the legislation shows was imperatively necessary), arbitrarily imposed upon the carriers the entire and enormous cost of an experimental increase in wages, without providing for any compensation to be paid in case the investigation should demonstrate the impropriety of the increase.

Upon the first of these points, I repeat that the sole authority of Congress to regulate these railroad corporations, including that company which is represented in the present action, arises from the fact that they voluntarily have devoted their property to the service of interstate commerce. I am unable to find in the Constitution any

authority on the part of Congress to commandeer the railroads, or the services of the trainmen.   The cases that are referred to as sustaining the supposed obligation of the carrier to carry on its business regardless of cost, and the authority of government to compel performance of that obligation (*Atlantic Coast Line R. R. Co.* v. *North Carolina Corporation Commission,* 206 U. S. 1, 27; *Missouri Pacific Railway* v. *Kansas,* 216 U. S. 262, 279; see, also, *Wisconsin &c. Railroad Co.* v. *Jacobson,* 179 U. S. 287, 302), were decisions sustaining the power of *state* governments to enforce obligations arising out of the grant by the State to the railroad company of the right of existence and the franchise to operate its road; and they were decided upon the authority of a line of decisions in the state courts (*Mayor &c. of Worcester* v. *Norwich &c. Railroad Co.,* 109 Massachusetts, 103, 113; *People* v. *Boston & Albany R. R. Co.,* 70 N. Y. 569, 571; *People* v. *New York &c. R. R. Co.,* 104 N. Y. 58, 67; *People* v. *St. Louis &c. R. R. Co.,* 176 Illinois, 512, 524) that based the right of control upon the power of the State to enforce the charter obligation and the reserved power to alter or amend the charter in the public interest.   The relation of the Federal Government to railroad companies not chartered by it is altogether different, being dependent entirely upon the fact that the companies have seen fit to engage in interstate transportation, a branch of business from which, in my opinion, they are at liberty to withdraw at any time,— so far as any authority of the Federal Government to prevent it is concerned,—however impracticable such withdrawal may be.

The extent to which regulation properly can go under such circumstances was defined very clearly by this court in the great case of *Munn* v. *Illinois,* 94 U. S. 113, where Mr. Chief Justice Waite, speaking for the court, said (p. 126): "Property does become clothed with a public interest when used in a manner to make it of public con-

sequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control." The control there referred to was a regulation by the State of the service performed by public warehouses and a limitation of the charges for that service. The opinion made it plain that the interest of the public was not in the property, but in the use of it; that not its management or disposition in general, but only the manner of its use in the service of the public, was subject to control.

The same limitation upon the authority of the public has been variously expressed in many decisions. Thus in *Interstate Com. Comm.* v. *Chicago G. W. Ry.*, 209 U. S. 108, 118, the court, by Mr. Justice Brewer, said: "It must be remembered that railroads are the private property of their owners; that while from the public character of the work in which they are engaged the public has the power to prescribe rules for securing faithful and efficient service and equality between shippers and communities, yet in no proper sense is the public a general manager." In *Southern Pacific Co.* v. *Interstate Com. Comm.*, 219 U. S. 433, 444, reference was made to the unwarranted assertion by the Commission of "a power which if it obtained would open a vast field for the exercise of discretion, to the destruction of rights of private property in railroads, and would in effect assert public ownership without any of the responsibilities which ownership would imply." And, in the *Minnesota Rate Cases*, 230 U. S. 352, 433, it was said: "The property of the railroad corporation has been devoted to a public use. There is always the obligation springing from the nature of the business in which it is

engaged—which private exigency may not be permitted to ignore—that there shall not be an exorbitant charge for the service rendered. But the State has not seen fit to undertake the service itself; and the private property embarked in it is not placed at the mercy of legislative caprice. It rests secure under the constitutional protection which extends not merely to the title but to the right to receive just compensation for the service given to the public."

The case last mentioned was one of alleged confiscation resulting from a state law limiting rates of freight, and the language quoted was appropriate to that topic. But the right to immunity from confiscation is not the only right of property safeguarded by the Fifth Amendment. Rights of property include something more than mere ownership and the privilege of receiving a limited return from its use. The right to control, to manage, and to dispose of it, the right to put it at risk in business, and by legitimate skill and enterprise to make gains beyond the fixed rates of interest, the right to hire employees, to bargain freely with them about the rate of wages, and from their labors to make lawful gains—these are among the essential rights of property, that pertain to owners of railroads as to others. The devotion of their property to the public use does not give to the public an interest in the property, but only in its use.

This act, in my judgment, usurps the right of the owners of the railroads to manage their own properties, and is an attempt to control and manage the properties rather than to regulate their use in commerce. In particular, it deprives the carriers of their right to agree with their employees as to the terms of employment. Without amplifying the point, I need only refer again to *Adair* v. *United States*, 208 U. S. 161, 174, 178.

I wholly dissent from the suggestion, upon which great stress is laid in the opinion of the majority of the court,

that the admittedly private right of the carriers and their employees to fix by agreement between themselves the standard of wages to control their relations—a right guaranteed by the "due process of law" clause, as this court repeatedly has held—can be set at naught or treated as waived in the present instance because the parties have failed to agree, or that legislative interference can be justified on that ground. The right to contract is the right to say by what terms one will be bound. It is of the very essence of the right that the parties may remain in disagreement if either party is not content with any term proposed by the other. A failure to agree is not a waiver but an exercise of the right—as much so as the making of an agreement.

To say that the United States has such a relation to interstate traffic and the transportation of the mails that it may interfere directly by force, or indirectly through the courts, to remove obstructions placed by wrongdoers in the way of such transportation (*In re Debs*, 158 U. S. 564, 582, 586), is not to say that, when obstruction is threatened, Congress, without taking over the railroads and paying just compensation to the owners, may exercise control of the revenues and dispose of them for the purpose of buying peace, either by direct intervention or through coercive legislation. To do this is to ignore the distinction between *meum* and *tuum*, to safeguard which was one of the objects of the Fifth Amendment.

The logical consequences of the doctrine now announced are sufficient to condemn it. If Congress may fix wages of trainmen in interstate commerce during a term of months, it may do so during a term of years, or indefinitely. If it may increase wages, much more certainly it may reduce them. If it may establish a minimum it may establish a maximum. If it may impose its arbitral award upon the parties in a dispute about wages, it may do the same in the event of a dispute between the railroads and

the coal-miners, the car-builders, or the producers of any other commodity essential to the proper movement of traffic.

That the act is a wide departure from all previous legislation for regulating commerce has been shown. The bearing of this upon the present point is obvious, since it is a safe assertion that every dollar of the thousands of millions that are invested in railroads in this country has been invested without any anticipation or reason for anticipating that a law of this character would be adjudged to be permissible, either as a regulation of commerce or on any other ground.

Upon the second ground of repugnancy to the Fifth Amendment I need not dwell, since it is dealt with fully in the dissenting opinion of Mr. Justice Day, with whose views upon that question I entirely agree.

MR. JUSTICE VAN DEVANTER concurs in this dissent, including that portion of MR. JUSTICE DAY's dissenting opinion just mentioned.

MR. JUSTICE McREYNOLDS, dissenting.

Whatever else the Act of September 3, 1916, may do, it certainly commands that during a minimum period of seven months interstate common carriers by railroads shall pay their employees engaged in operating trains for eight hours' work a wage not less than the one then established for a standard day—generally ten hours.

I have not heretofore supposed that such action was a regulation of commerce within the fair intendment of those words as used in the Constitution; and the argument advanced in support of the contrary view is unsatisfactory to my mind. I cannot, therefore, concur in the conclusion that it was within the power of Congress to enact the statute.

But, considering the doctrine now affirmed by a majority of the court as established, it follows as of course that Congress has power to fix a maximum as well as a minimum wage for trainmen; to require compulsory arbitration of labor disputes which may seriously and directly jeopardize the movement of interstate traffic; and to take measures effectively to protect the free flow of such commerce against any combination, whether of operatives, owners, or strangers.