The motion to remand will be sustained.

---

### ST. LOUIS UNION TRUST CO. v. MISSOURI & N. A. R. CO.

(District Court, E. D. Arkansas, W. D. February 21, 1921.)

Constitutional law ⊕⟾297—Master and servant ⊕⟾69—Railroad receiver's reduction of wages regulated by federal Transportation Act permissible, to prevent denial of constitutional guaranty.

    In view of the provisions of Const. U. S. Amend. 5, the receiver for railroad property which has been operated at a continuous loss, both before and since the receivership, and where the gross earnings are insufficient to pay operating expenses, and money can no longer be borrowed on receiver's certificates, may be authorized to reduce wages of employees below the scale fixed by the United States Railroad Labor Board by decision No. 2, in effect May 1, 1920, without being subject to the penalty provided by Transportation Act, § 312.

In Equity. Suit by the St. Louis Union Trust Company against the Missouri & North Arkansas Railroad Company. On petition of receiver for instructions.

J. S. Rowland, of Harrison, Ark., for receiver.

⊕⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

TRIEBER, District Judge. The receiver appointed by the court in this cause has filed a petition asking for advice. In the petition it is alleged that effective February 1, 1921, after consultation with the judge of this court, and by his direction, the scale of wages of all officers and employees of the Missouri & North Arkansas Railroad Company was reduced to the basis in effect April 30, 1920; that objections to said reductions have been filed by certain classes of employees through their recognized representatives, and the receiver asked to continue the scale of wages existing by direction of the United States Railroad Labor Board in its decision No. 2, which became effective May 1, 1920. Attached to the petition is a very elaborate report of the condition of this railway ever since it was organized down to date. Exhibits are filed showing the income and operating expenses from 1907, when the road was built, to December, 1920, and an itemized statement of the earnings and expenditures for the years 1919 and 1920, the deficit for the month of January, 1921, the operating ratios for the years 1919 and 1920, and the salaries and wages paid to the employees in all the departments.

From the statements filed it is shown that, from the time the road was built and placed in operation to this date, there has never been a dividend paid to the stockholders, not a dollar of interest has ever been paid on the bonds, and that there has been a net loss of $2,445,-884.24 from the operation of the road. Omitting the deficit, while the road was under control of the government, which amounted to $1,168,644, the operation of the road, since the appointment of the receiver, including the interest paid on the receiver's certificates, the expenditures of operation to January 1, 1921, exceeded the gross earnings $985,898.20.

When the road was placed in the hands of the receiver in the foreclosure proceedings by the mortgagee in this action, the road was in such condition that it could not be operated with safety. A great many of the ties were rotten; more than 40 per cent. of the rails were worn out; the bridges were in an unsafe condition; there was little rolling stock, and not sufficient locomotives to operate the road. After a hearing, the court authorized the issuance of receiver's certificates in order to make the road safe for operation. A little over $2,000,000 of receiver's certificates were issued, the mortgagee assenting, that they be declared a lien prior to that of the mortgage. As the earnings were not always sufficient to pay the interest, after payment of operating expenses and taxes, some additional receiver's certificates had to be sold in order to meet the interest. There has been a deficit in the operation of the road since the road was turned back by the government to the receiver, but as the government paid the deficit up to September 1st, it is only necessary to consider deficits since then, which amounted to $412,702.20. The deficit for the month of January, 1921, amounted to $56,015.66. The monthly reports filed by the receiver in court, and which are open to the public, show these deficits. These deficits cannot be met, as no money can be borrowed at any price.

It is also shown that considerable expenditures will be necessary to put the road in condition to operate it with safety. It will require about 1,000 tons of rails to replace those worn out. Additional rolling stock will have to be purchased and other expenditures made, which are absolutely necessary if the road is to be operated.

The receiver's certificates heretofore issued are practically without a market, and if any new certificates are issued they could not be sold at any price. But, even if there were a market for them at some price, the court would be disinclined to authorize a sale of them, knowing that the interest thereon could not be paid. Courts must be just as honest as corporations and individuals, and if it incurs a debt, it must see its way clear to be able to pay at least the interest on it. To do otherwise would be practicing a fraud on the lenders. For this reason, to attempt to borrow money on additional receiver's certificates, assuming they could be sold, is out of the question.

Only one of two remedies is left: To stop the operation of the road, or to cut down expenses wherever it is possible. To cease operating the road ought only to be resorted to, if no other remedy is left. Industries have been established along the road in reliance on the operation of the railway. These industries are entirely dependent on this road, to obtain raw material and to ship to the market the finished material. Without this road being operated, the investments in these industries would be absolutely destroyed. Many of the farmers residing along the road, and large numbers of others who have purchased lands and settled along the road, have planted valuable apple orchards, and have no other means of sending their product to market, except this road. To deprive them of the means of marketing the fruit means the destruction of the orchards. The court would therefore not be justified to stop the operation of the road, if it is at all possible to continue its operation. Therefore the only other remedy left is to reduce the salaries and wages of the employees at the same time, if it can be done without reducing them below a level which will enable them to provide for themselves and their families. The salary of the receiver, who is also the general manager of the road, has been reduced by the court 20 per cent. and has been accepted by the receiver.

The important question is whether, in view of these facts, which are indisputable, the receiver would be subject to punishment under the provisions of section 312 of the Transportation Act of February 28, 1920, c. 91, 41 Stat. p. 473. It may be conceded that the act is a constitutional exercise of the powers granted by the Constitution to Congress. But it is not conclusive that a carrier, whose earnings are insufficient to pay the wages established by the Railroad Labor Board, and unable to obtain by loans the money necessary to comply with its order, can be punished for failing to comply with the order.

To require it to continue in business at a loss is beyond the powers of Congress or a state. In Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U. S. 396, 40 Sup. Ct. 183, 64 L. Ed. 323, the act of the state of Louisiana requiring a carrier to continue the operation of a road at a loss was held to be unconstitutional, as depriving the carrier of its property. While the opinion fails to state that the

invalidity is by reason of the Fourteenth Amendment to the Constitution of the United States, it could rest on no other ground. Reaffirmed in Bullock v. State of Florida, 254 U. S. ——, 41 Sup. Ct. 193, 65 L. Ed. ——.

In this case, the Transportation Act having been enacted by Congress, the Fourteenth Amendment would not apply; but the Fifth Amendment to the Constitution does apply to acts of Congress. As the language used in both of these amendments is the same the same rule of construction must be applied to one as to the other. As stated in Twining v. New Jersey, 211 U. S. 78, 101, 29 Sup. Ct. 14, 20 (53 L. Ed. 97):

"If any different meaning of the same words [referring to the Fifth Amendment] as they are used in the Fourteenth Amendment, can be conceived, none has yet appeared in judicial decisions."

That it does so apply has been conclusively determined in Ft. Smith & Western R. R. Co. v. Mills, 253 U. S. 206, 40 Sup. Ct. 526, 64 L. Ed. 862. In that case the question before the court was whether a railroad, not quite as badly situated as the Missouri & North Arkansas Railroad is, can be compelled to comply with the provisions of the act of Congress known as the Adamson Law, 39 Stat. 721 (Comp. St. §§ 8680a–8680d), and it was held that, although that act had been held to be constitutional in Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1026:

"It was not decided that there might not be circumstances to which the act could not be applied consistently with the Fifth Amendment, or that the act in spite of its universal language must be construed to reach literally every carrier by railroad subject to the act to regulate commerce."

It is true in that case both parties, the employer and employees, wished to go on as before; the receiver having made satisfactory terms with its men. In the instant case some of the employees have quit work and the others are protesting against the reduction of their wages. But the places of those who have declined to continue their employment have been filled by others equally competent and efficient, who are willing to accept the wages offered by the receiver, and, should the other employees see proper to quit, the receiver assures the court that he can fill their places, having many applications from competent men, who are willing to accept employment at the wages offered.

In the opinion of the court the receiver is authorized and directed to pay the wages in force prior to April 30, 1920.