**LOUISVILLE AND NASHVILLE RAILROAD COMPANY, Plaintiff,**

v.

**Clifford E. BASS et al., Defendants.**

**Civ. A. No. 6568.**

United States District Court,
W. D. Kentucky,
Louisville Division.

May 5, 1971.

John P. Sandidge, Woodward, Hobson & Fulton, M. D. Jones, Eugene W. Herde, David M. Yearwood, Louisville, Ky., for plaintiff.

William V. Seiller, Ewen, MacKenzie & Peden, Herbert L. Segal, Segal, Isenberg, Sales & Stewart, Louisville, Ky., Richard R. Lyman, Mulholland, Hickey & Lyman, Toledo, Ohio, for defendants.

## JUDGMENT GRANTING PERMANENT INJUNCTION

JAMES F. GORDON, Chief Judge.

This cause having been submitted upon a stipulation of the parties which includes all the material facts, and after oral and written presentation of arguments by counsel and, for the reasons and grounds set forth more fully in the Court's detailed Findings of Fact, and Conclusions of Law and Opinion entered in this cause directing the entry of Judgment for the plaintiff in accordance therewith, the Court, being fully advised in the premises, finds:

1. On or about November 8, 1968, notices were served upon the plaintiff and other Class I railroads pursuant to § 6 of the Railway Labor Act (45 U.S.C.A. § 156) by the International Association of Machinists and Aerospace Workers, International Brotherhood of Electrical Workers, Sheet Metal Workers International Association and International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Help-

ers (herein referred to as the "shopcraft unions"). These notices sought proposed changes in general wage rates and certain other wage adjustments. On or about November 29, 1968, the railroads served their counter-proposals upon the four unions. The subsequent handling of all these notices was upon a national basis.

2. The dispute involving these § 6 notices was handled by the duly authorized representatives of the parties thereto through all the major dispute procedures of the Railway Labor Act (45 U.S.C.A. § 151 et seq.) and, on December 4, 1969, both groups of representatives initialed a Memorandum of Understanding which set forth the terms of an agreement acceptable to all the representatives. However, the members of one of the four shopcraft unions declined to ratify the agreement and the dispute remained unresolved as to all of the unions. An authorized nationwide strike by all four unions was threatened to commence on March 5, 1970.

3. (a) On March 4, 1970, Congress enacted and the President of the United States signed into law Senate Joint Resolution No. 180, Public Law 91–203, which Joint Resolution extended to 12:01 A.M. on April 11, 1970, the "cooling off" period of Section 10 of the Railway Labor Act (45 U.S.C.A. § 160) with respect to this dispute.

(b) On April 8, 1970, Congress also enacted Senate Joint Resolution No. 190, Public Law 91–226. On April 9, 1970, the President of the United States signed into law this Joint Resolution which provided for a final resolution of this dispute upon the basis of the Memorandum of Understanding reached by all representatives of the parties on December 4, 1969.

4. Notwithstanding the enactment and signing into law of Senate Joint Resolutions Nos. 180 and 190, the individual defendants named in the caption hereof, and others acting in concert and participating with them, commenced a strike against the L & N at approxi-

mately 10:00 P.M. on April 8, 1970, and continued said strike and picketing of the plaintiff until April 13, 1970. The defendants were employees of the plaintiff and were each employed in one of the four shopcraft unions at the time of the strike. The purpose of the strike, picketing and work stoppage was to cause the L & N to cease operations in connection with this labor dispute, which actions were contrary to both Senate Joint Resolutions Nos. 180 and 190, and which dispute was settled by enactment of Senate Joint Resolution No. 190.

5. The strike, picketing and work stoppage of the named defendants and those acting in concert with them involved in this case were not authorized nor ratified by any official of any of the four shopcraft unions or by any official of any of the local lodges of the aforesaid four shopcraft unions.

6. The strike and picketing engaged in by the named defendants and others acting in concert and participating with them continued until the afternoon of April 13, 1970, and did not cease until contempt proceedings against certain defendants were in progress before this Court.

7. The strike and picketing engaged in by the named defendants and those acting in concert and participating with them resulted in other employees of the L & N refusing to cross the picket lines and the L & N's operations in the Louisville, Kentucky area were drastically curtailed. The effects of the strike and picketing increased daily and were felt throughout L & N's operations in several states. The named defendants, as well as many other unnamed defendants, are ready, willing and able to engage in a strike against the L & N and have informed the Court that they will do so unless this Court upholds the validity of Senate Joint Resolutions Nos. 180 and 190, or otherwise restrains their actions by an injunction.

8. Immediate and irreparable injury will result to the L & N unless the strike, picketing and work stoppage continues to be enjoined by this Court. The L & N has no adequate remedy at law and no adequate remedy other than injunctive relief to prevent the continuance of the strike, picketing and work stoppage. If such strike continues, it will cause the cessation of movement of freight and passengers on the plaintiff's line and in interstate commerce and will cause the plaintiff to lose large sums daily in revenue from freight, and will cause the plaintiff to incur fixed charges in a large amount daily without any revenue. The amount involved exceeds the sum of Ten Thousand Dollars ($10,000), exclusive of interest and costs.

9. Plaintiff seeks a permanent injunction against the named defendants, and others who acted in concert and participated with them, from engaging in this strike, picketing and work stoppage. The defendants, by their answer and counterclaim, seek to have declared unconstitutional Senate Joint Resolutions Nos. 180 and 190 and seek to enjoin the plaintiff from interfering with constitutional rights asserted by them.

The Court concludes:

A. That it has jurisdiction of the subject matter and of the parties to this action for the purpose of granting a permanent injunction;

B. That the issues raised by the defendants upon their counterclaim present no substantial federal constitutional question and the Court overrules the defendants' request for the appointment of a three-judge court pursuant to the provisions of 28 U.S.C. § 2282;

C. That the strike, picketing and work stoppage conducted by the named defendants and those acting in concert with them against the L & N were in violation of Senate Joint Resolution No. 180 when commenced and, since April 9, 1970, such actions have been and would continue to be in violation of Senate Joint Resolution No. 190;

D. That the strike, picketing and work stoppage conducted by the named defendants and those acting in concert

with them also constitute an unauthorized wildcat strike in violation of the provisions of the Railway Labor Act (45 U.S.C.A. § 151 et seq.) ;

E. That the permanent injunction should be issued as prayed for in the complaint, as amended.

It is, therefore, ordered, adjudged and decreed, that the defendants, Clifford E. Bass, A. W. Richardson, R. D. Chandler, J. L. Dawson, Paul A. Stafford, Jack E. Collins, John P. Stirling, Robert N. Bryant, Gary L. Steiger, Lee E. Padgett, David W. Hess, George W. Powell, Charles E. Hansbrough, N. W. Shelton, W. T. Glover, III, W. M. Higgins, J. R. Richardson, Paul D. French, James T. Stirling, Barney Hoskins, John D. Eaves, James M. Fulton, Herbert D. Gibson, E. E. Everidge, Kenneth D. Young and J. M. Stayton, and all persons in active concert or participating with them, be and they are hereby enjoined:

(a) From engaging in a strike, picketing or work stoppage against the plaintiff in connection with the dispute over the § 6 notices served in November 1968 and which dispute was finally resolved by the Congress by enactment of Senate Joint Resolution No. 190, and from carrying out the threat of the wildcat strike over this dispute.

(b) From, for the purposes set out in (a), in any manner impeding, obstructing, hampering or interfering with the business of the plaintiff.

(c) From, for the purposes set out in (a), preventing or attempting to prevent by any species of intimidation, threats, force or coercion, any of the plaintiff's officers, agents, employees, representatives, and others having business with the plaintiff, from entering, leaving, and transacting business on its premises.

(d) From, for the purposes set out in (a), picketing the properties of the plaintiff and from interfering with ingress or egress from its premises, including delivery, unloading, and dispatching of its rolling stock and other equipment, in, on, about and between the plants and premises of its customers, or from loitering or congregating at or near any of the approaches thereto, or upon any public street or highway leading into or from any place the employees of the plaintiff desire to enter or leave in route from or to said premises.

(e) From, for the purposes set out in (a), inducing, or attemping to induce, others to participate in any strike, picketing or stoppage of work or interruption of the operation of the plaintiff's railroad.

It is further ordered that the plaintiff's motion to strike certain defenses be and it is hereby overruled as this action is decided on the merits.

It is further ordered that the counterclaim of the defendants against plaintiff be and it is hereby dismissed.

It is further ordered that, since the restraining order which was continued by agreement has now been made permanent, that the L & N, as principal, and the Fidelity and Deposit Company of Maryland, as Surety, upon its Bond filed in this action in the amount of $2,000.00, dated April 9, 1970, are hereby discharged and the premium for said bond shall be taxed as an item of cost against the defendants.

It is further ordered and adjudged that the plaintiff is awarded its costs in this action.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION OF THE COURT

This action is one for a permanent injunction to prohibit the resumption of a strike and picketing which initially were commenced against the plaintiff on April 8, 1970 and continued for several days thereafter. A counterclaim was filed on behalf of the pickets in which they seek a permanent injunction against the plaintiff's interference with their constitutional rights. The restraining order against the strike and picketing was continued in effect, with the consent of the parties, pending a decision on the merits. There was no dispute of any material fact and the evidence pertain-

ing to all material facts is contained in the stipulation recently filed by the parties.

The Court has considered the evidence and heard arguments of counsel and makes its findings upon the facts and renders its conclusions of law.

## THE FACTS

Plaintiff, Louisville and Nashville Railroad Company (herein sometimes called L & N), is a corporation organized under the laws of the State of Kentucky and is engaged in the transportation of freight and passengers by rail in interstate commerce and is a "carrier" as defined in Section 1 of the Railway Labor Act (45 U.S.C.A. § 151).

The defendants, Clifford E. Bass, A. W. Richardson, R. D. Chandler, J. L. Dawson, Paul A. Stafford, Jack E. Collins, John P. Stirling, Robert N. Bryant, Gary L. Steiger, Lee E. Padgett, David W. Hess, George W. Powell, Charles E. Hansbrough, N. W. Shelton, W. T. Glover, III, W. M. Higgins, J. R. Richardson, Paul D. French, James T. Stirling, Barney Hoskins, John D. Eaves, James M. Fulton, Herbert D. Gibson, E. E. Everidge, Kenneth D. Young and J. M. Stayton and the members of the class represented by them were each employed in one of the four shopcrafts of the L & N at the time of the strike, picketing and work stoppage involved in this litigation.

The International Association of Machinists and Aerospace Workers is an unincorporated association and a labor organization which is the collective bargaining representative under the Railway Labor Act for L & N's employees classified generally as machinists, their helpers and apprentices. The International Brotherhood of Electrical Workers is an unincorporated association and a labor organization which is the collective bargaining representative under the Railway Labor Act for the L & N's employees classified generally as electricians, their helpers and apprentices. The Sheet Metal Workers is an unincor-

porated association and a labor organization which is the collective bargaining representative under the Railway Labor Act for L & N's employees classified generally as sheet metal workers, their helpers and apprentices. The International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers is an unincorporated association and a labor organization which is the collective bargaining representative under the Railway Labor Act for L & N's employees classified generally as boilermakers, their helpers and apprentices.

All four of the aforementioned labor unions (herein referred to as the "shopcraft unions") joined together for the purpose of bargaining nationally with the nation's railroads, including the L & N, pursuant to notices served under Section 6 of the Railway Labor Act (45 U.S.C.A. § 156) which proposed changes in general wage rates and certain other wage adjustments and pursuant to counter-proposals served by the railroads upon the shopcraft unions. For many years, proposals under Section 6 of the Railway Labor Act by the shopcraft unions to the carriers or by the carriers to the shopcraft unions for changes in general rates of pay, rules, or working conditions have been the subject of multi-carrier national bargaining, usually referred to in railroad labor parlance as "national handling". Such labor disputes have been settled by national agreement or arbitration awards applicable to all the carriers participating in such national handling.

On or about November 8, 1968, the shopcraft unions served upon the carriers identical notices pursuant to Section 6 of the Railway Labor Act which proposed changes in general wage rates and certain other wage adjustments applicable to employees represented by the shopcraft unions. On or about November 29, 1968, the carriers served these unions with identical notices, pursuant to Section 6 of the Railway Labor Act of their counter-proposals to be handled concurrently with the unions'. proposals.

In each of their aforesaid Section 6 Notices, the shopcraft unions requested the carrier to bargain on a multi-carrier national basis in accordance with the established practice, after initial conferences on each individual carrier failed to produce agreement. In accordance with that request and with the established practice followed for many years, the carriers authorized the National Railway Labor Conference and the regional Carriers' Conference Committees to negotiate the dispute created by the Section 6 Notices to a conclusion in multi-carrier national handling. On or about March 17, 1969, multi-carrier national bargaining between the national representatives of the carriers and the shopcraft unions commenced. No agreement was reached.

On or about April 10, 1969, the parties jointly applied under Section 5 First of the Railway Labor Act (45 U.S.C.A. § 155 First) for the mediation services of the National Mediation Board. On or about April 14, 1969, the National Mediation Board docketed the dispute as its Case No. A–8563 and on or about June 18, 1969, commenced mediation. The mediation was conducted on a multi-carrier national basis between the national bargaining representatives of the carriers and the shopcraft unions. Mediation did not bring about an agreement settling the dispute, and on or about August 19, 1969, the National Mediation Board requested the parties to submit the dispute to arbitration pursuant to Sections 7 and 8 of the Railway Labor Act (45 U.S.C.A. §§ 157, 158). The carriers accepted the proffer of arbitration on August 21, 1969, but the unions declined to do so on August 22, 1969. Accordingly, on or about September 3, 1969, the National Mediation Board notified the parties in writing that its mediatory efforts had failed and that it was on that day terminating its services.

On October 3, 1969, by Executive Order 11386, the President of the United States created an emergency board pursuant to Section 10 of the Railway Labor Act (45 U.S.C.A. § 160) to investigate the dispute. On November 2, 1969, the emergency board rendered its report. The carriers agreed to accept the emergency board recommendations but the shopcraft unions declined to do so.

Thereafter, the national representatives of the carriers met with the representatives of the shopcraft unions in a further attempt to settle the parties' dispute. On December 4, 1969, both groups of representatives initialed a "Memorandum of Understanding" which set forth the terms of an agreement acceptable to all these representatives. However, the union representatives stated that they would require ratification by the members of each of their unions before they would sign a contract embodying the terms of the Memorandum of Understanding. Subsequently, the representatives of the Sheet Metal Workers International Association announced that the parties' agreement had not been ratified by the members of that union and that further concessions by the carriers would be necessary to settle the dispute. The members of the three other unions (the great majority of the shopcraft employees involved) approved the parties' agreement, but the representatives of all four unions declined to execute a written agreement embodying the terms set forth in the parties' Memorandum of Understanding unless the carriers made additional concessions satisfactory to all four unions. Further negotiations failed to resolve the matter. On March 3, 1970, William W. Winpinsinger, spokesman for the shopcraft unions regarding the dispute, announced that the shopcraft unions would strike all 128 of the Class I railroads, including the L & N, and that the strike would commence at 12:01 A.M. on March 5, 1970.

On March 4, 1970, Congress enacted, and the President of the United states signed into law, Senate Joint Resolution No. 180, Public Law 91–203 (herein sometimes referred to as S.J.R. 180), which Joint Resolution extended to 12:01 A.M. on April 11, 1970, the "cooling off" period of Section 10 of the

Railway Labor Act (45 U.S.C.A. § 160) with respect to this dispute.

In addition, on April 8, 1970, Congress enacted Senate Joint Resolution No. 190, Public Law 91-226 (herein sometimes referred to as S.J.R. 190), which Joint Resolution provided for a resolution of the dispute involved herein, and on April 9, 1970, the President of the United States signed into law this Joint Resolution. This Act of Congress settled the dispute upon the basis of the terms and conditions contained in the Memorandum of Understanding negotiated by the duly authorized collective bargaining representatives of the parties, but which had not been finally accepted by the representatives of the defendants.

Notwithstanding the enactment of S.J.R. 180, the individual defendants and others acting in concert and participating with them did commence a strike against the L & N at approximately 10:00 P.M. on April 8, 1970, and, notwithstanding the enactment of S.J.R. 190, the strike and picketing of the plaintiff continued until contempt proceedings were in progress on April 13, 1970. The purpose of the strike, picketing and work stoppage was to cause the L & N to cease operations in connection with this labor dispute between the parties, which actions were contrary to S.J.R. 180, and which dispute was settled by the enactment of S.J.R. 190.

On April 9, 1970, the L & N filed this action seeking a temporary restraining order, preliminary injunction and permanent injunction against the defendants and others acting in concert and participating with them from striking or picketing L & N's premises over this dispute, alleging that the strike and picketing were unlawful and in violation of the Railway Labor Act, as amended by S.J.R. 180. On April 9, 1970, this Court entered a temporary restraining order enjoining the defendants and others acting in concert or participating with them from striking or picketing the L & N over this dispute contrary to S.J.R. 180. On April 10, 1970, this Court entered a second temporary restraining order enjoining the defendants and others acting in concert or participating with them from striking or picketing the L & N over this dispute contrary to S.J.R. 190. By amendment to its complaint filed on April 22, 1970, the L & N further alleged that the strike was an unauthorized wildcat strike; that such a wildcat strike is also in violation of the Railway Labor Act, irrespective of the enactment of Senate Joint Resolutions Nos. 180 and 190, and prayed for a permanent injunction upon this additional ground.

The strike, picketing and work stoppage involved in this case were not authorized nor ratified by any official of any of the four shopcraft unions nor by any official of any of the local lodges of the four unions.[1]

In addition to the 26 named defendants there were numerous other L & N employees who were engaged with them in the strike and picketing. The named defendants are sued herein individually and as representatives of a class of plaintiff's employees who acted in concert and participated with them in the conduct of the strike and picketing, the class being so numerous that joinder of all of them is impracticable. There are questions of law and fact common to this class. The claims or defenses of the class of these representative parties are typical of the claims or defenses of the entire class and the named defendants will fairly and adequately represent the interests of the class in this action. The prosecution of separate actions against individual members of the class would create a risk of inconsistent or varying adjudications with respect to in-

---

1. The four shopcraft unions had originally been included as named defendants but were dismissed by order of the Court upon the filing in the record of a stipulation signed by counsel for all parties that the strike involved in this case was not authorized nor ratified by any of the four unions and, thus, was a wildcat strike.

dividual members of the class which would establish incompatible standards of conduct for the plaintiff and would create a risk of adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not named as parties to the adjudications. The plaintiff has acted on grounds generally applicable to the class as a whole, thereby making appropriate final judgment or decree with respect to the class as a whole.

The strike and picketing engaged in by the named defendants and others acting in concert and participating with them continued until the afternoon of April 13, 1970, and other employees of the L & N refused to cross the picket lines and L & N's operations in the Louisville, Kentucky area were drastically curtailed. The effects of the strike and picketing increased daily and were felt throughout L & N's operations in several states. The named defendants, as well as many other unnamed defendants, are ready, willing and able to engage in a strike against the L & N and will do so unless this Court upholds the validity of the Senate Joint Resolutions or otherwise continues to restrain their actions by an injunction. Immediate and irreparable injury will result to the L & N unless the strike, picketing and work stoppage continues to be enjoined by this Court. L & N has no adequate remedy at law and no adequate remedy, other than injunctive relief to prevent the continuance of the strike, picketing and work stoppage, is available to the L & N.

The defendants believe and assert, by way of defense of their activities, that Senate Joint Resolutions Nos. 180 and 190 are unconstitutional and, by their counterclaim filed herein, seek a permanent injunction against the L & N from interfering with their constitutional rights under the First, Fifth and Thirteenth Amendments to the Constitution of the United States. These defendants initially sought the appointment of a three-judge District Court but they withdrew this request prior to the submission of this case for decision.

The terms set forth in the Memorandum of Understanding of December 4, 1969, and as imposed upon the parties by S.J.R. 190, have been and are being effectuated on the L & N, including the payment of the increased wages provided for therein to the defendants and to members of the class represented by them. L & N has fully complied with S. J.R. 190 and has effectuated and paid the rate increases imposed upon it by this Act and the defendants have accepted and retained all such payments, including separate checks for the retroactive wage increase.

### The Issues

Summarily stated, three basic issues are presented for determination by the Court, as follows:

(1) The issue as to whether, by acceptance of the benefits of S.J.R. 190 (Public Law 91–226), the defendants waived their objections and are now estopped to challenge the validity of this Act.

(2) The issue pertaining to the validity of S.J.R. 180 (Public Law 91–203) and S.J.R. 190 (Public Law 91–226).

(3) The issue as to whether the strike and picketing not authorized nor ratified by the duly authorized collective bargaining representatives of the crafts and classes involved (a so-called wildcat strike) are violative of the Railway Labor Act.

### Conclusions of Law And Opinion

This Court has jurisdiction to decide the issues presented. This action arises under the Acts of Congress of June 25, 1948 (28 U.S.C.A. §§ 1331 and 1337), and other Acts of Congress regulating commerce, viz., the Railway Labor Act, as amended (45 U.S.C.A. § 151 et seq.) and the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.). Senate Joint Resolution No. 180 (Public Law 91–203, ef-

fective March 4, 1970), and Senate Joint Resolution No. 190 (Public Law 91–2̃6, effective April 9, 1970) are also Acts of Congress regulating commerce. The Court will decide each of the issues presented.

■ (1) The Court is not impressed with the authorities relied upon by plaintiff in support of its argument that, by acceptance of the monetary benefits of S.J.R. 190, the defendants waived their objections to it and are now estopped to challenge the constitutionality of this Act. In fact, when one believes seriously that rights accorded to him by law have been or are being violated, the proper forum in an orderly society for the vindication and protection of such rights is the courts. This Court is not disposed to effectively preclude the defendants from presenting their position in such forum. The Court concludes that an estoppel is not operable against the defendants as to their right to attack by litigaiton the constitutionality of S.J.R. 190.

(2) As S.J.R. 180 expired under its own terms at 12:01 A.M. on April 11, 1970, and since both sides seek only injunctive relief for the future, the issue concerning the validity of S.J.R. 180 is now moot. However, the issue concerning the constitutionality of S.J.R. 190 is not moot and is next considered by the Court.

■■ Despite the defendants' withdrawal of their application for a three-judge District Court, a threshold question involved is whether this Court is nevertheless precluded by 28 U.S.C. § 2282 from deciding the constitutionality of S.J.R. 190.[2] The statutory requirements for a three-judge court are not applicable unless the questions raised as to the constitutional validity of an Act of Congress are substantial. Jameson & Co. v. Morgenthau, 307 U.S. 171, 59 S. Ct. 804, 83 L.Ed. 1189 (1939). A

three-judge court is not required nor authorized when the claim that the statute is unconstitutional is plainly insubstantial. Hobson v. Tobriner, 255 F.Supp. 295 (D.C.D.C.1966), Eason v. Dickson, 390 F.2d 585 (C.A.9, 1968), cert. denied 392 U.S. 914, 88 S.Ct. 2076, 20 L.Ed.2d 1373 (1968).

■ The test for insubstantiality was laid down by the Supreme Court in Ex Parte Poresky, 290 U.S. 30, p. 32, 54 S. Ct. 3, p. 4, 78 L.Ed. 152 (1933), when the Court stated:

"* * * The question may be plainly unsubstantial, either because it is 'obviously without merit' or because 'its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy'."

The issues involved here have been determined by prior decisions of the courts, including the Supreme Court. Wilson v. New, 243 U.S. 332, 37 S.Ct. 298, 61 L.Ed. 755 (1917); B. L. F. & E. et al. v. Chicago, B. & Q. R. Co. et al., 225 F.Supp. 11 (D.C.D.C. 1964), affirmed B. L. F. & E. v. Certain Carriers, 118 U.S.App.D.C. 100, 331 F.2d 1020 (1964), cert. denied 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964). This circumstance precludes the question from being regarded as substantial.

Wilson v. New, *supra*, arose out of a national dispute between the railroads and their employees over union proposals to establish a basic eight-hour day with no reduction in wages. All efforts to reach agreement failed and, to finally resolve the dispute in the face of a strike, Congress enacted a statute (39 Stat. 721) which, in effect, enacted the basic eight-hour day into law and made it a part of the existing agreements. The Statute also required the railroads to pay the same compensation for an

2. While defendants withdrew their request for the appointment of a three-judge court, they did not withdraw or dismiss their counterclaim by which they, in ef-

fect, seek to enjoin enforcement of S.J.R. 190 on the ground that the Act is unconstitutional.

eight-hour day which they previously had been paying for a ten-hour day (the basic day on most railroads) for a stated temporary period. The Supreme Court stated that the provision making the basic eight-hour day a permanent part of the agreements between the carriers and unions did not raise any constitutional problem whatsoever. The Court stated (243 U.S. p. 346, 37 S.Ct. p. 301):

"* * * [W]e put the question as to the eight-hour standard entirely out of view, on the ground that the authority to permanently establish it is so clearly sustained as to render the subject not disputable."

The Court also held that the statute fixing the wages to be paid "* * * was clearly within the legislative power of Congress to adopt, and * * * in substance and effect * * * amounted to an exertion of its authority under the circumstances disclosed to compulsorily arbitrate the dispute between the parties. * * *" (243 U.S. at 351, 37 S.Ct. at 303).

The Supreme Court expressly limited the effect of its decision to the power of Congress to regulate both employers and employees who are engaged in a business charged with a public interest. The constitutional power of the Congress to regulate the railroads is well established. This power of Congress also exists with respect to the regulation of the employees of the railroads in matters relating to their employment (243 U.S. at 352, 37 S.Ct. 298).

However, with respect to the regulation of railroads and their employees, the decision in Wilson v. New is not an aberration which one would expect to be narrowly construed today or overruled by the Supreme Court. To the contrary, in 1964, by enactment of Public Law 88–108 (77 Stat. 132), Congress provided for compulsory arbitration of a dispute over the use of locomotive firemen and over the consist of train crews. The constitutionality of that statute was upheld in Brotherhood of Locomotive Firemen and Enginemen v. Chicago, B. &. Q. R. Co., 225 F.Supp. 11 (D.C., 1964), affirmed per curiam 118 U.S. App.D.C. 100, 331 F.2d 1020 (1964), cert. denied 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964). The District Court, which wrote the basic opinion in that case, regarded the decision in Wilson v. New as controlling and concerning it, stated (p. 22):

"Counsel for the plaintiffs attempt to distinguish the two statutes in that the 1916 Act involved in the Wilson case was a legislative decision as to hours and wages, whereas in the Act here involved, the Congress delegated to a board the power to make the determination. It requires no argument, however, to demonstrate that Congress has the authority to delegate its legislative power in this respect to administrative agencies."

There are a large number of cases which demonstrate the broad authority of the Congress, under the Commerce Clause of the Constitution, to enact legislation affecting the relationship between railroads and their employees.[3] However, the Wilson v. New and *Chicago, B. & Q. R. Co.* cases eliminate any question concerning the constitutionality of S.J.R. 190.[4] The purpose of the statutes involved in those two cases was identical with the purpose of the legislation under review here. While there are some differences between the mechanics of those statutes and the mechanics of the present legislation, the Court cannot perceive any constitutional significance

---

3. The Railway Labor Act, as amended in 1934 (45 U.S.C.A. § 151 et seq.), is a classic illustration of this and numerous decisions pertaining to this Act are cited herein (see pages 743–746, *infra.*)

4. It is noted that, in 1967, the Congress also enacted Public Law 90–54 (81 Stat. 122) which, in effect, provided for compulsory arbitration of a national wage and work rules dispute between the railroads and six shopcraft unions and that no one even sought to have that Statute declared unconstitutional.

in those differences. Certainly, if the Congress can directly impose its own solution to a collective bargaining dispute in the railroad industry, as Wilson v. New clearly held could be done, or impose the solution for resolution by an arbitration board, as the *Chicago, B. & Q. R. Co.* case clearly held could be done, then, *a fortiori*, there is no basis at all for believing that the Congress cannot impose the solution tentatively accepted by the representatives of all parties to the dispute in free collective bargaining when they initialed the "Memorandum of Understanding". If anything, the latter approach would appear to be less open to constitutional objection than the approaches of the earlier statutes which have withstood the attacks upon their constitutionality.

Consequently, it is clear beyond question that S.J.R. 190 is a constitutional exercise of power by the Congress and the question of its constitutionality raised by the individual defendants in this case is totally without substance.

(3) Aside from the question of the validity of S.J.R. 190, the strike and picketing involved in this case are unlawful for another reason. The record here discloses that the strike and picketing were not authorized or ratified by any officials of the four shopcraft unions or by any official of any of the local lodges of the four shopcraft unions. In labor parlance, it was a wildcat strike. The pressing of demands by individual employees through a wildcat strike is repugnant to the statutory plan prescribed by the Railway Labor Act.

The Railway Labor Act, as interpreted by the Supreme Court, recognizes two separate types of railway labor disputes referred to as "major" disputes and "minor" disputes. The first class relates to disputes over the formation of collective bargaining agreements and looks to the acquisition of rights for the future. "Minor" disputes contemplate the existence of an agreement and are controversies as to rights accrued, usually involving only one employee. Elgin,

J. & E. R. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945); Brotherhood of R. Trainmen v. Chicago River & I. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

By enactment of § 3 First of the Act, Congress has provided a complete statutory plan for the orderly and peaceful settlement of all minor disputes. In Brotherhood of Locomotive Engineers v. Louisville & N. R. Co., 373 U.S. 33, pp. 38, 39, 83 S.Ct. 1059, p. 1062, 10 L.Ed.2d 172 (1963), the Supreme Court stated:

"The several decisions of this Court interpreting § 3 First have made it clear that this statutory grievance procedure is a mandatory, exclusive, and comprehensive system for resolving grievance disputes. The right of one party to place the disputed issue before the Adjustment Board, with or without the consent of the other, has been firmly established. Brotherhood of R. R. Trainmen v. Chicago R. & I. R. Co., 353 U.S., at 34, [77 S.Ct., at 637]. And the other party may not defeat this right by resorting to some other forum. * * * In Union Pacific R. Co. v. Price, 360 U.S. 601 [79 S.Ct. 1351, 3 L.Ed.2d 1460], the Court held that an employee could not resort to a common law action for wrongful discharge after the same claim had been rejected on the merits in a proceeding before the Adjustment Board. The decision in that case was based upon the conclusion that, when invoked, the remedies provided for in § 3 First were intended by Congress to be the complete and final means for settling minor disputes. * * * "

"Of even more particularized relevance to the issue now before us is this Court's decision in Brotherhood of R. R. Trainmen v. Chicago R. & I. R. Co., supra. * * * In an opinion which reviewed at length the legislative history of the 1934 amendments, the Court concluded that this history entirely supported the plain import of the statutory language—that Congress had intended the grievance procedures

of § 3 First to be a compulsory substitute for economic self-help, not merely a voluntary alternative to it. * * * "

In that case, the Court was dealing with a strike which had been authorized by the unions. The existence of the complete statutory plan for the orderly settlement of minor disputes cannot be squared with the contention that Congress did not purport to foreclose strikes over minor disputes, whether they are authorized by the union or are wildcat strikes. The Congressional purpose is completely truncated if wildcat strikes are held not to come within this statutory ban on self-help with respect to minor disputes. Cf. National Airlines, Inc. v. International Ass'n. of M. & A. W., 416 F.2d 998, note 3, page 1003 (C.A.5, 1969).

■ There are equally compelling reasons why wildcat strikes are in violation of the major disputes procedures of the Railway Labor Act. The language of the Railway Labor Act makes it clear that the prescribed procedures which may lead up to the right to strike over a major dispute must be followed by the employees through their authorized representatives. Thus, Section 2 Second of the Act (45 U.S.C.A. § 152 Second) requires that:

"All disputes between a carrier * * * and its * * * employees shall be considered, and, if possible, decided, * * * in conference between representatives designated and authorized so to confer, respectively, by the carrier * * * and by the employees. * * * " (Emphasis added).

Similarly, the only kind of dispute which may eventually lead to a strike must be initiated by a written proposal by one of the parties through their representatives only. Thus, Section 6 of the Act (45 U.S.C.A. § 156) provides that "representatives of the employees shall give at least thirty days' written notice of an intended change in agreements" and that there must follow within a specified time "the

beginning of conference between the representatives of the parties. * * * " (Emphasis added).

Under other provisions of the Railway Labor Act the representatives of the employees must be selected by the majority of the craft or class of employees to be represented (§ 2 Fourth, 45 U.S.C.A. § 152 Fourth); and the employees must be left free to select such representatives without interference from the carrier (§ 2 Third, 45 U.S.C.A. § 152 Third). The National Mediation Board must determine any dispute among the employees as to the identity of their representative and must certify its determination to the employees and to the carrier (§ 2 Ninth, 45 U.S.C.A. § 152 Ninth). That section provides:

"Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter." (Emphasis added).

The language of the Act thus reveals a bargaining scheme under which the carrier must negotiate only with the duly designated representative of the employees, and, conversely, the employees must present their demands only through their designated representative. This is the interpretation of the Act given by the Supreme Court in Virginian Ry. Co. v. System Federation, 300 U. S. 515, 548, 57 S.Ct. 592, 81 L.Ed. 789 (1937). The carrier in that case first contended that it had no enforceable duty to bargain with the union at all, to which the Court responded by holding that the Act requires the carrier to engage in good faith bargaining with the union. The Court stated (p. 548, 57 S. Ct. p. 599):

"It [The Act] at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose differences—in short, to enter into a negotiation for the settlement of labor

disputes such as is contemplated by section 2, First."

The carrier then urged that it was also free to bargain with the employees themselves and to meet their demands directly without dealing with the union, to which the Supreme Court made this often-quoted answer concerning the obligation of the carrier to "treat" with the union and "to treat with no other" as follows (p. 548, 57 S.Ct. p. 599):

" * * * Both the statute and the decree [by the trial court] are aimed at securing settlement of labor disputes by inducing collective bargaining with the true representative of the employees and by preventing such bargaining with any who do not represent them. The obligation imposed on the employer by section 2, Ninth, to treat with the true representative of the employees as designated by the Mediation Board, when read in the light of the declared purposes of the Act, and of the provisions of § 2, Third and Fourth, giving to the employees the right to organize and bargain collectively through the representative of their own selection, is exclusive. *It imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other.*" (Emphasis added).

The Supreme Court subsequently made it clear that the duty to treat only with the designated representative of the employees carries through to all stages of every "major dispute". See Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, pp. 728–729, 65 S.Ct. 1282, p. 1292, 89 L.Ed. 1886 (1945) in which Opinion the Court stated:

"The statute itself vests exclusive authority to negotiate and to conclude agreements concerning major disputes in the duly selected collective agent. * * * [T]his exclusive authority includes representation of the employees not only in the stage of conference, but also in the later ones of mediation, arbitration and conciliation."

Later cases show that the duty to treat only with the designated representative applies even after all the mandatory "major disputes" procedures of the Act have been exhausted. Ruby v. American Airlines, Inc., 329 F.2d 11, 17, 20–21 (1964); Flight Engineers Int'l Assn., etc. v. Eastern Air Lines, Inc., 208 F. Supp. 182, 192–194 (S.D.N.Y., 1962), aff'd. on basis of opinion below, 307 F. 2d 510 (C.A.2, 1962).

The pressing of demands by individual employees through a wildcat strike is wholly contrary and repugnant to the statutory scheme. By engaging in a wildcat strike, the dissidents, in effect, ask the carrier to treat with them over the problem at hand, not with the authorized representative. This plainly violates the bargaining requirements of the Act and is squarely contrary to the decisions of the Supreme Court in *Virginian* and *Burley*.

 Moreover, by disregarding the bargaining procedures of the Act in favor of strike action, the employees violate the most fundamental obligation of the Act, the obligation imposed by Section 2 First to "exert every reasonable effort to make and maintain agreements * * * and to settle all disputes * * * in order to avoid any interruption to commerce." The Supreme Court has called that obligation the "heart" of the Railway Labor Act. Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 377, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). Wildcat strikes were involved in Brotherhood of Ry. & S. S. Clerks, etc. v. Railroad Retirement Board, 99 U.S.App.D.C. 217, 239 F.2d 37 (1956) and National Airlines, Inc. v. International Ass'n of Machinists, 416 F.2d 998 (C.A.5, 1969). While there were other grounds in those cases for holding the strikes in violation of the Railway Labor Act, both of the Courts of Appeal noted the fact that wildcat strikes were involved and relied,

in part, upon the requirements of Section 2 First in holding the strikes violative of the Railway Labor Act. In the first of these two cases, the Court referred to the unauthorized nature of the strike and, in the Opinion written by Judge Burger, stated (239 F.2d p. 44):

"The Board has also concluded that the action of the Local in commencing the strike on September 24 violated Section 2, First of the Railway Labor Act. * * * The striking employees did not comply with their President's order and the refusal to do so is a measure of how union discipline had broken down in the hostile atmosphere which developed. There is substantial basis in the record for the Board's conclusion that such action by the Local disregarded the requirements of the Act to exert reasonable efforts to avoid interruption of commerce."

In the National Airlines case, *supra*, the Court stated (416 F.2d p. 1003, note 3):

"[I]t would hardly serve the purpose of the Act to hold that wildcat strikes, such as the strike involved here, did not come within the statutory ban on self-help. Moreover, it should be noted that § 2 of the Act provides that 'it shall be the duty of * * * employees to exert every reasonable effort to make and maintain agreements * * * and to settle all disputes * * * in order to avoid any interruption to commerce or to the operation of any carrier * * *.'"

This Court has before it the question of the validity of a wildcat strike under the Railway Labor Act only and holds that it is impliedly proscribed by that Act.

■ The defendants assert, as they must, a constitutional right to strike. While there is certainly no prohibition against an employee from resigning from his or her employment, the Supreme Court has held that there is no constitutional right to strike. In Dor-

chy v. Kansas, 272 U.S. 306, p. 311, 47 S.Ct. 86, p. 87, 71 L.Ed. 248 (1926), Justice Brandeis, speaking for the Court, stated: "Neither the common law, nor the Fourteenth Amendment, confers the absolute right to strike."

■ Moreover, the Congress, under the Commerce Clause of the Constitution, has the power to regulate the employment relationship of employers and employees engaged in an interstate business charged with a public interest and, when exercised, that power is paramount. The Railway Labor Act is a result of the exercise of that power by Congress. While that Act contains no express prohibition against strikes, it has been construed by numerous courts, including the Supreme Court, to impliedly prohibit strikes in various situations, though not in all. See, *e. g.* Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 725, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945); Brotherhood of R. Trainmen v. Chicago River & I. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Union Pacific R. Co. v. Price, 360 U.S. 601, 611–612, n. 10, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959); Brotherhood of Locomotive Engineers v. Louisville & N. R. Co., 373 U. S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963), affirming 297 F.2d 608 (C.A.6, 1962) and 190 F.Supp. 829 (W.D.Ky., 1961); Norfolk & P. B. L. R. Co. v. Brotherhood of R. Trainmen, 248 F.2d 34 (C.A.4, 1957), cert. denied 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958); Louisville & N. R. Co. v. Brown, 252 F. 2d 149, 153 (C.A.5, 1958), cert. denied 356 U.S. 949, 78 S.Ct. 913, 2 L.Ed.2d 843 (1958); Brotherhood of Ry. & S. S. Clerks, etc. v. Railroad Retirement Board, 99 U.S.App.D.C. 217, 239 F.2d 37 (1956); Brotherhood of R. Trainmen v. New York Central R. Co., 246 F.2d 114 (C.A.6, 1957), cert. denied 355 U.S. 877, 78 S.Ct. 140, 2 L.Ed.2d 107 (1957). In the case cited last, the Court of Appeals for this Circuit stated (p. 117):

"It is not every dispute between an employer and employees that justifies the right to strike. In Dorchy v.

State of Kansas, 272 U.S. 306, 311, 47 S.Ct. 86, 87, 71 L.Ed. 248, Mr. Justice Brandeis, in discussing circumstances which did not justify a strike said: 'The right to carry on business—be it called liberty or property—has value. To interfere with this right without just cause is unlawful. * * * Neither the common law, nor the Fourteenth Amendment, confers the absolute right to strike."

That the Congress has the constitutional power to prohibit strikes in the railroad industry is made manifestly clear by the foregoing cases. Congress has exercised such power to the extent necessary to make unlawful the strike and picketing engaged in by the named defendants and the other employees who acted in concert and participated with them.

An appropriate judgment will be entered granting plaintiff's motion for a permanent injunction and sustaining its motion to dismiss the counterclaim.